CONTEMPORARY MISSION, INC.,
Plaintiff-Appellee-Cross-Appellant,

v.

FAMOUS MUSIC CORPORATION,
Defendant-Appellant-Cross-Appellee.

Nos. 575, 616, Dockets 76–7403, 76–7440.

United States Court of Appeals,
Second Circuit.

Argued Nov. 22, 1976.

Decided May 18, 1977.

William B. Lawless, New York City (John F. Triggs, Hawkins, Delafield & Wood, New York City, of counsel), for defendant-appellant.

William D. O'Reilly, Windham, N. H., for plaintiff-appellee.

Before MANSFIELD, VAN GRAAFEILAND and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal by Famous Music Corporation ("Famous") from a verdict rendered against it in favor of Contemporary Mission, Inc. ("Contemporary"), in the United States District Court for the Southern District of New York, after a jury trial before Judge Richard Owen. Contemporary cross-appeals from a ruling which excluded testimony concerning its prospective damages. The dispute between the parties relates to Famous' alleged breach of two contracts.

I. *The Facts.*

Contemporary is a nonprofit charitable corporation organized under the laws of the State of Missouri with its principal place of business in Connecticut. It is composed of a small group of Roman Catholic priests who write, produce and publish musical compositions and recordings.[1] In 1972 the group owned all of the rights to a rock opera entitled VIRGIN, which was composed by Father John T. O'Reilly, a vice-president and member of the group. Contemporary first became involved with Famous in 1972 as a result of O'Reilly's efforts to market VIRGIN.

Famous is a Delaware corporation with its headquarters in the Gulf + Western Building in New York City. It is a wholly-owned subsidiary of the Gulf + Western Corporation,[2] and, until July 31, 1974, it was engaged in the business of producing musical recordings for distribution throughout the United States. Famous' president, Tony Martell, is generally regarded in the recording industry as the individual primarily responsible for the successful distribution of the well-known rock operas TOMMY and JESUS CHRIST SUPERSTAR.

The relationship between Famous and Contemporary was considerably more harmonious in 1972 than it is today. At that time, Martell thought he had found, in VIRGIN, another TOMMY or JESUS CHRIST SUPERSTAR, and he was anxious to acquire rights to it. O'Reilly, who was encouraged by Martell's expertise and enthusiasm, had high hopes for the success of his composition. On August 16, 1972, they executed the so-called "VIRGIN Recording Agreement" ("VIRGIN agreement") on behalf of their respective organizations.

The terms of the VIRGIN agreement were relatively simple. Famous agreed to pay a royalty to Contemporary in return for the master tape recording of VIRGIN and the exclusive right to manufacture and sell records made from the master. The agreement also created certain "Additional Obligations of Famous" which included, *inter alia* : the obligation to select and appoint, within the first year of the agreement, at least one person to personally oversee the

---

1. For a further description of the group see *Robert Stigwood Group, Ltd. v. O'Reilly*, 346 F.Supp. 376, 379 (D.Conn.1972), *rev'd*, 530 F.2d 1096 (2d Cir. 1976).

2. Gulf + Western and another of its wholly-owned subsidiaries, Paramount Pictures Corp., were originally named as co-defendants. All of the causes of action pleaded against these co-defendants were dismissed by the trial judge. Contemporary has not appealed from those rulings, and thus neither Gulf + Western nor Paramount are parties to this appeal.

Jurisdiction is founded upon diversity of citizenship. 28 U.S.C. § 1332. None of the defendants are incorporated in or have their principal places of business in Missouri or Connecticut. There is no dispute that the substantive law of New York governs. *See Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Griffin v. McCoach*, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481 (1941); *Geller v. New England Industries, Inc.*, 535 F.2d 1381, 1385 (2d Cir. 1976); *Music Research, Inc. v. Vanguard Recording Society, Inc.*, 547 F.2d 192, 195 n.3 (2d Cir. 1976).

nationwide promotion of the sale of records, to maintain contact with Contemporary and to submit weekly reports to Contemporary; the obligation to spend, within the first year of the agreement, no less than $50,000 on the promotion of records; and the obligation to release, within the first two years of the agreement, at least four separate single records from VIRGIN. The agreement also contained a non-assignability clause which is set out in the margin.[3]

On May 8, 1973, the parties entered into a distribution contract which dealt with musical compositions other than VIRGIN. This, the so-called "Crunch agreement," granted to Famous the exclusive right to distribute Contemporary's records in the United States. Famous agreed to institute a new record label named "Crunch," and a number of records were to be released under it annually. Contemporary agreed to deliver ten long-playing records and fifteen single records during the first year of the contract. Famous undertook to use its "reasonable efforts" to promote and distribute the records. Paragraph 15 of the Crunch agreement stated that a breach by either party would not be deemed material unless the non-breaching party first gave written notice to the defaulting party and the defaulting party failed to cure the breach within thirty days. The notice was to specify the nature of the alleged material breach. The contract prohibited assignment by Contemporary, but it contained no provision relating to Famous' right to assign.

Although neither VIRGIN nor its progeny was ever as successful as the parties had originally hoped, the business relationship continued on an amicable basis until July 31, 1974. On that date, Famous' record division was sold to ABC Records, Inc. (ABC). When O'Reilly complained to Martell that Famous was breaking its promises, he was told that he would have to look to ABC for performance. O'Reilly met with one of ABC's lawyers and was told that ABC was not going to have any relationship with Contemporary. On August 21, 1974, Contemporary sent a letter to Famous pursuant to paragraph 15 of the Crunch agreement notifying Famous that it had "materially breached Paragraph 12,[4] among others, of [the Crunch] Agreement in that [it had] attempted to make a contract or other agreement with ABC–Dunhill Record Corporation (ABC Records) creating an obligation or responsibility in behalf of or in the name of the Contemporary Mission." This lawsuit followed.

## II. The Jury Verdict.

Contemporary brought this action against several defendants and asserted several causes of action. By the time the case was submitted to the jury the only remaining defendant was Famous and the only remaining claims were that (1) Famous had failed to adequately promote the VIRGIN and Crunch recordings prior to the sale to ABC, (2) Famous breached both the VIRGIN and Crunch agreements when it sold the record division to ABC, and (3) Famous breached an oral agreement to reimburse Contemporary for its promotional expenses. The latter claim has no relevance to this appeal.

---

3. Paragraph 29 of the VIRGIN agreement provides, in full, as follows:

   This Agreement shall not be assignable by FAMOUS, except in the voluntary sale of FAMOUS' entire business in which the present work is used, or in connection with a merger between FAMOUS and another business organization, or to a majority-owned subsidiary or division of FAMOUS engaged in the same business as FAMOUS, *all conditioned upon the execution and delivery to [Contemporary] of an agreement whereby the assignee agrees to be bound by the obligations of this Agreement.* (emphasis added).

4. Paragraph 12 of the Crunch agreement provides, in full, as follows:

   This agreement shall not be construed as one of partnership or joint venture, nor shall it constitute either party as the agent or legal representative of the other. Neither party shall have the right, power or authority to make any contract or other agreement, or to assume or create any obligation or responsibility, express or implied, in behalf of or in the name of the other party or to bind the other party in any manner for anything whatsoever.

The district judge submitted the case to the jury in two parts: the first portion as to liability and the second concerning damages. The court's questions and the jury's answers as to liability and damages are set forth below:

### Liability Questions

1. Has plaintiff established by a fair preponderance of the credible evidence that Famous breached the Virgin agreement by failing to adequately promote Virgin in its various aspects as it had agreed?

Yes.

2. If you find a failure to adequately promote, did that cause plaintiff any damage?

Yes.

3. Did the assignment of the Virgin contract by Famous to ABC cause any damage to plaintiff?

Yes.[5]

4. Did plaintiff establish by a fair preponderance of the credible evidence that Famous failed to use "its reasonable efforts consistent with the exercise of sound business judgment" to promote the records marketed under the Crunch label?

No.

5. Did plaintiff establish by a fair preponderance of the credible evidence that there was a refusal by ABC to perform the Crunch contract and promote plaintiff's music after the assignment?

Yes.

6. If your answer is "yes" to either 4 or 5 above, did such a breach or breaches of the Crunch agreement cause plaintiff any damage?

Yes.

7. Did Tony Martell, on behalf of Famous, in talking to any member of plaintiff, make any agreement to reimburse plaintiff for the expense of its members promoting their music around the country?

Yes.

### Damage Questions

1. To what damages is plaintiff entitled under the Virgin agreement?

$68,773.

2. To what damages is plaintiff entitled under the Crunch agreement?

$104,751.

3. To what unallocated damages as between the Virgin and Crunch and oral agreements is plaintiff entitled—if any?

$21,000.[6]

4. To what damages, if any, is plaintiff entitled under the oral agreement?

$16,500.

### III. Discussion.

On this appeal, Famous attacks the verdict on several grounds. Their first contention is that the evidence was insufficient to support the jury's response to liability question number 1. Their second contention is that the jury's response to liability question number 4 precludes a recovery for non-performance of the Crunch agreement. Their third contention is that Contemporary failed to comply with the notice provision of the Crunch agreement. Their final contention is that Contemporary is estopped from suing for a breach of the Crunch agreement. We find none of these arguments persuasive.

### A. The VIRGIN Agreement.

■■■ Judge Owen charged the jury as a matter of law that Famous breached the VIRGIN agreement by assigning it to ABC without getting from ABC a written agreement to be bound by the terms of the VIRGIN agreement. A reading of para-

---

**5.** Judge Owen charged the jury as a matter of law that the assignment to ABC constituted a breach of the VIRGIN agreement's non-assignability clause. *See* note 3, *supra.*

**6.** The parties agree that if Famous is entitled to a reversal of the verdict as to either of the two contracts, it will also be entitled to a reversal of this award. Because we affirm the verdict as to both contracts, we affirm the award of unallocated damages.

graph 29 of the agreement[7] reveals that that charge was entirely correct, and Famous does not challenge it on this appeal. Famous vigorously contends, however, that the jury's conclusion, that it had failed to adequately promote VIRGIN prior to the sale to ABC, is at war with the undisputed facts and cannot be permitted to stand. *O'Connor v. Pennsylvania R.R. Co.*, 308 F.2d 911, 915 & n.5 (2d Cir. 1962). In particular they argue that they spent the required $50,000[8] and appointed the required overseer for the project.[9] The flaw in this argument is that its focus is too narrow. The obligations to which it refers are but two of many created by the VIRGIN agreement. Under the doctrine of *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917), Famous had an obligation to use its reasonable efforts to *promote* VIRGIN on a nationwide basis. That obligation could not be satisfied merely by technical compliance with the spending and appointment requirements of paragraph 14 of the agreement. Even assuming that Famous complied fully with those requirements, there was evidence from which the jury could find that Famous failed to adequately promote VIRGIN. The question is a close one, particularly in light of Martell's obvious commitment to the success of VIRGIN and in light of the efforts that were in fact exerted and the lack of any serious dispute between the parties prior to the sale to ABC. However, there was evidence that Famous prematurely terminated the promotion of the first single record, "Got To Know," shortly after its release, and that Famous limited its promotion of the second record, "Kyrie," to a single city, rather than promoting it nationwide.[10] Moreover, there was evidence that, prior to the sale to ABC,

7. *See* note 3, *supra*.

8. Martell testified that he was certain that over $50,000 had been spent. Melvin Schlissel, Famous' Vice-President of Finance, testified that in early 1973 he prepared a report that indicated that approximately $50,000 had been spent on the promotion of VIRGIN as of the date of the report. The report itself would have been admissible under the business records exception to the hearsay rule, Fed.R.Evid. 803(6), but the report had been lost, so the trial judge admitted oral proof of its contends, Fed. R.Evid. 1004. None of the parties recognized that the result was an oral business record—an apparent contradiction in terms. We express no view on the admissibility of an oral business record, for its admission is not claimed as error on this appeal.

Although Famous' proof that it spent over $50,000 was uncontradicted, the proof itself was not particularly strong; indeed, it was rather imprecise and self-serving. The jury could quite properly have concluded that the proof was insufficient.

Famous contends that Contemporary waived the $50,000 spending requirement. In return for an advance of $7,500, Contemporary agreed that

Famous Music Corporation shall be relieved of its obligation to expend a minimum of $50,000.00 in the promotion of "Virgin" record sales if, as and when, in the sole option of Famous Music Corporation, such promotion shall cease to be effective and profitable.

This agreement did not operate as a present waiver of the spending requirement, as Famous contends. It granted Famous an option not to spend "if, as and when, in the sole option of

Famous," the promotion became ineffective and unprofitable. Famous' argument is premised upon the notion that it had "absolute discretion concerning how much, if any, of the $50,000 to spend, and its opinion could not be challenged." This is not true. Under New York law there is implied in every contract a covenant of fair dealing and good faith. *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933); *see, e. g., Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co., Inc.*, 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 333, 281 N.E.2d 142, 144, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972). Thus, Famous' determination of effectiveness or profitability of promotion would have to be made in good faith. There is no indication that such a good faith determination was in fact made.

9. It is clear that the personal overseer requirement was met. Martell himself was actively and extensively engaged in the promotional effort. In addition, Herb Gordon was clearly put in charge of the day-to-day supervision of the promotion. This adequately complied with the provisions of paragraph 14.

10. We recognize that the limited promotion of "Kyrie" was a result of "test marketing," *i. e.,* the concentration of promotional efforts in one area before expanding the efforts to the rest of the country. However, because the promotion of "Kyrie" was thus limited, Famous only marketed three single records on a *nationwide* basis, and the contract required the nationwide promotion of four.

Famous underwent a budget reduction and cut back its promotional staff. From this, the jury could infer that the promotional effort was reduced to a level that was less than adequate. On the whole, therefore, we are not persuaded that the jury's verdict should be disturbed.

## B. *The Crunch Agreement.*

■ There is no dispute that the sale of Famous' record division to ABC constituted an assignment of the Crunch agreement to ABC. The assignment of a bilateral contract includes both an assignment of rights and a delegation of duties. *See* 3 Williston on Contracts § 418 (3d ed. 1960). The distinctions between the two are important.

> Perhaps more frequently than is the case with other terms of art, lawyers seem prone to use the word "assignment" inartfully, frequently intending to encompass within the term the distinct [concept] of delegation . . . . . An assignment involves the transfer of rights. A delegation involves the appointment of another to perform one's duties.

J. Calamari & J. Perillo, Contracts § 254 (1970) (footnote omitted). Famous' arguments with respect to the Crunch agreement ignore this basic distinction, and the result is a distortion of several fundamental principles of contract law.

■■ It is true, of course, as a general rule, that when rights are assigned, the assignor's interest in the rights assigned comes to an end. When duties are delegated, however, the delegant's obligation does not end.

> [O]ne who owes money or is bound to any performance whatever, cannot by any act of his own, or by any act in agreement with any other person, except his creditor, divest himself of the duty and substitute the duty of another. "No one can assign his liabilities under a contract without the consent of the party to whom he is liable."

> This is sufficiently obvious when attention is called to it, for otherwise obligors would find an easy practical way of escaping their obligations . . . . .

3 Williston on Contracts § 411 (3d ed. 1960) (footnote omitted). This is not to say that one may not delegate his obligations. In fact, most obligations can be delegated—as long as performance by the delegate will not vary materially from performance by the delegant.[11] The act of delegation, however, does not relieve the delegant of the ultimate responsibility to see that the obligation is performed. If the delegate fails to perform, the delegant remains liable. *Davidson v. Madison Corp.,* 257 N.Y. 120, 125, 177 N.E. 393, 394 (1931); *Devlin v. Mayor,* 63 N.Y. 8, 16 (1875).

■ Judge Owen correctly charged the jury that "after the assignment of the contract by Famous to ABC, Famous remained liable for any obligation that was not fulfilled by ABC." This was a correct statement of the law, and Famous' assault upon it, while valiant, is without merit.

Our conclusion also disposes of Famous' evidentiary argument. The argument is that since Famous is being held liable for a breach by ABC, and since the only proof of a breach by ABC was proof of ABC's repudiation, and since the evidence of repudiation was hearsay,[12] there was no admissible

---

11. *Paige v. Faure,* 229 N.Y. 114, 118, 127 N.E. 898, 899 (1920); *New York Bank Note Co. v. Hamilton Bank Note Engraving & Printing Co.,* 180 N.Y. 280, 291–93, 73 N.E. 48, 51 (1905); *Devlin v. Mayor,* 63 N.Y. 8, 17 (1875); 3 Williston on Contracts § 411, at 20–21 (3d ed. 1960); Restatement of Contracts § 160(3)(a) (1932); *cf.* U.C.C. 2–210(1).

Although the matter is not without considerable doubt, we shall assume, *arguendo,* that the duty to promote Contemporary's records was not sufficiently personal to bar its delegation. The fact that Martell worked for Famous rather than ABC, however, would appear to militate in favor of the opposite conclusion.

12. The evidence in question is O'Reilly's testimony to the effect that a lawyer for ABC told him that ABC wanted nothing to do with Contemporary. Judge Owen admitted the testimony on the ground that the statement was a verbal act, which, like an offer or an acceptance, is admissible to prove the fact that the statement was made, rather than to prove the truth of the matter asserted. A verbal act, of

proof of a breach by ABC, and, therefore, Famous cannot be held liable. This argument fails because it was unnecessary for Contemporary to prove that ABC breached, or repudiated, any obligation. All Contemporary was required to do was to prove that no one performed Famous' obligation to promote after the sale to ABC. This it clearly did. Performance by ABC would have been an affirmative defense for Famous,[13] but in order to prevail it was not necessary for Contemporary to disprove an affirmative defense that was neither pled nor proved by Famous. Because Contemporary's proof of ABC's refusal to perform was unnecessary to make out its cause of action, we need decide whether that proof was admissible.

■ Famous also maintains that, even if there were a breach, Contemporary is barred from asserting it, because it failed to adequately comply with the notice requirement contained in the Crunch agreement. We find this argument unpersuasive. The letter sent by Contemporary to Famous shortly after the sale to ABC gave Famous adequate notice that Contemporary considered the contract to have been materially breached as a result of the sale, which had led to the "illegal seizure of our property from the marketplace," an obvious reference to evidence that the Crunch (and VIRGIN) record inventory had been removed from retail stores and shipped to ABC without notice to Contemporary, with probable harm to promotion and sales. Indeed, Famous' president, Martell, had advised O'Reilly of this fact before the latter's visit to ABC in early August 1974. While it is true that the letter directs Famous' attention to "Paragraph 12,[14] among others," and that a breach of paragraph 12 was not the

basis for Contemporary's ultimate recovery, under the circumstances, it would be hypertechnical to upset the verdict on the ground that the notice was insufficient.[15] We decline to construe the notice provision as if it were a common law pleading requirement under which every slip would be fatal. The purpose of the written notice requirement was to permit Famous within 30 days to cure any material breach. Contemporary's August 19, 1974, telegram, construed in the light of the earlier Martell-O'Reilly conversation with respect to the removal of the record inventory from retail stores was sufficient to place Famous under a duty to communicate immediately with ABC and to insure that the contract was being performed according to its terms. Had it done so, it would have found (as had O'Reilly a few days earlier) that ABC was not fulfilling Famous' obligations under the contract but was taking the position that it would not have anything to do with Contemporary. The problem for Famous, of course, was that, having sold its entire record division to ABC, it had stripped itself of its ability to cure the breach.

■ Famous' final contention is that Contemporary is estopped from suing for a breach of the Crunch agreement. According to Famous, because Contemporary has always claimed that the assignment was void *ab initio*, it is estopped to claim that Famous is vicariously liable for a breach by ABC, because if the assignment was void, ABC had no obligation which could have been breached. This argument is without merit because it is premised upon the mistaken notion that Famous is being held liable for a breach by ABC. Such is not the case. The basis for the recovery is not a

course, is not hearsay. McCormick on Evidence § 249 (1972).

**13.** *See Hoffman v. Whitbread,* 227 App.Div. 733, 236 N.Y.S. 578 (2d Dept. 1929); *Mishell v. Greenspan,* 76 N.Y.S.2d 412 (Sup.Ct. N.Y. Co. 1947); *Apparel & Accessories Associates, Inc. v. New York World's Fair 1940, Inc.,* 176 Misc. 26, 26 N.Y.S.2d 522 (Sup.Ct. N.Y. Co. 1940), *aff'd,* 261 App.Div. 944, 26 N.Y.S.2d 528 (1st

Dept. 1941); *cf. Irving Trust Co. v. Park & Tilford Import Corp.,* 250 App.Div. 570, 294 N.Y.S. 822 (1st Dept. 1937).

**14.** *See* note 4, *supra.*

**15.** *Shapiro v. Employers Liability Assurance Corp.,* 139 Misc. 454, 248 N.Y.S. 587 (Sup.Ct. Bronx Co. 1931).

breach by ABC, it is a breach by Famous after the sale to ABC.[16]

## IV. *The Cross-Appeal.*

■ During the trial, Contemporary sought to introduce a statistical analysis, together with expert testimony, in order to prove how successful the most successful of its single recordings, "Fear No Evil," would have become if the VIRGIN agreement had not been breached as a result of the sale to ABC. Based upon its projection of the success of that recording, Contemporary hoped to prove what revenues that success would have produced. Judge Owen excluded this evidence on the ground that it was speculative. *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974).

■ There can no dispute that Contemporary "is entitled to the reasonable damage flowing from the breach of" the VIRGIN agreement by Famous, and that "the measure of the damage is the amount necessary to put [Contemporary] in [the] exact position as [it] would have been if the contract had not been breached." *Perma Research & Dev. v. Singer Co.*, 542 F.2d 111, 116 (2d Cir.), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976). Nor can there be any dispute as to the New York rules concerning the measure of proof required to prove the existence of damage and the measure of proof necessary to enable the jury to fix its amount. It is clear that the existence of damage must be certain—a requirement that operates with particular severity in cases involving artistic creations such as books, *Freund v. Washington Square Press, Inc., supra*, movies, *Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 121 N.E. 756 (1919), plays, *Bernstein v. Meech*, 130 N.Y. 354, 29 N.E. 255 (1891), and, by analogy, records. What all of these have in common is their dependence upon taste or fancy for success. When the existence of damage is uncertain or speculative, the plaintiff is limited to the recovery of nominal damages. On the other hand,

> if the plaintiff has given valuable consideration for the promise of performance which would have given him a chance to make a profit, the defendant should not be allowed to deprive him of that performance without compensation unless the difficulty of determining its value is extreme. Especially is this true where there is no chance of loss.

11 Williston on Contracts § 1346, at 242 (3d ed. 1968). Thus, under the long-standing New York rule, when the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will not be denied a recovery of substantial damages. *See Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 456 (2d Cir. 1977); *W. L. Hailey & Co. v. County of Niagara*, 388 F.2d 746, 753 (2d Cir. 1967) (collecting New York cases). Moreover, the burden of uncertainty as to the amount of damage is upon the wrongdoer, *Perma Research & Dev. v. Singer, supra*, 542 F.2d at 116, and the test for admissibility of evidence concerning prospective damages is whether the evidence has any tendency to show their probable amount. *Duane Jones Co. v. Burke*, 306 N.Y. 172, 192, 117 N.E.2d 237, 247–48 (1954). The plaintiff need only show a "stable foundation for a reasonable estimate of royalties he would have earned had defendant not breached." *Freund v. Washington Square Press, Inc., supra*, 34 N.Y.2d at 383, 357 N.Y.S.2d at 861, 314 N.E.2d at 421. "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." *Entis v. Atlantic Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir. 1964). "[T]he law will make the best appraisal that

---

**16.** We express no view on the question of whether Contemporary could have recovered against ABC as well as Famous as a result of ABC's assumption of Famous' obligations pursuant to paragraph 2(b) of the contract between Famous and ABC. The fact that Contemporary might have been able to recover against ABC for its failure to perform has no bearing on the ultimate responsibility of Famous, as the delegant, to insure that performance is rendered. Moreover, we intimate no view on the question of whether Famous is entitled to indemnification under paragraph 8.2 of its contract with ABC.

it can, summoning to its service whatever aids it can command." *Sinclair Rfg. Co. v. Jenkins Co.*, 289 U.S. 689, 697, 53 S.Ct. 736, 739, 77 L.Ed. 1449 (1933).

We are confident that under the principles enunciated above the exclusion of the evidence proffered by Contemporary was error. This is not a case in which the plaintiff sought to prove hypothetical profits from the sale of a hypothetical record at a hypothetical price in a hypothetical market. At the time of the sale to ABC, the record was real, the price was fixed, the market was buying and the record's success, while modest, was increasing. Even after the promotional efforts ended, the the record was withdrawn from the marketplace, it was carried, as a result of its own momentum, to an additional 10,000 sales and to a rise from approximately number 80 on the "Hot Soul Singles" chart of Billboard magazine to number 61. It cannot be gainsaid that if someone had continued to promote it, and if it had not been withdrawn from the market, it would have sold more records than it actually did. Thus, it is certain that Contemporary suffered some damage in the form of lost royalties. The same is not true, however, of the existence of damage in the form of lost opportunities for concert tours, theatrical tours or similar benefits. While it is certain that some sales were lost as a result of the failure to promote, we cannot believe that under *Freund* the New York courts would accept what Famous' counsel aptly described at trial as Contemporary's "domino theory" of prospective damages. The theory is that if "Fear No Evil" had become a "hit," its success would have stimulated additional sales of the full two-record VIRGIN album and would have generated sufficient popular acceptance to enable Contemporary to obtain bookings for a nationwide concert tour. We hold that these additional benefits are too dependent upon taste or fancy to be considered anything other than speculative and uncertain, and, therefore, proof of damage in the form of such lost benefits was properly excluded by Judge Owen. *Freund v. Washington Square Press, Inc.,*

*supra; see Devlin v. Mayor, supra,* 63 N.Y. at 25–26.

█ We next turn to the question of whether the evidence as to the amount of lost royalties was relevant under the standards set out above. Because "Fear No Evil" ultimately reached number 61 on the record charts, Contemporary offered a statistical analysis of every song that had reached number 61 during 1974. This analysis showed that 76 percent of the 324 songs that had reached number 61 ultimately reached the top 40; 65 percent reached the top 30; 51 percent reached the top 20; 34 percent reached the top 10; 21 percent reached the top 5; and 10 percent reached number 1. If the trial judge had admitted this evidence, Contemporary was prepared to offer the testimony of an expert witness who could have converted these measures of success into projected sales figures. The sales figures could be converted into lost royalties in accordance with the terms of the VIRGIN agreement.

Famous vigorously maintains, and Judge Owen agreed, that the data was incomplete because it failed to account for such factors as the speed with which the various records rose upward (the most successful records generally rise quickly—passing number 61 in their third or fourth week—"Fear No Evil" had risen relatively slowly—number 61 in ten weeks); the reputations of the various artists performing the recordings (Contemporary had no prior hit records and was relatively unknown); and the size and ability of the company promoting the recordings. We agree that a more accurate prediction of the success of "Fear No Evil" would be likely to result if the statistical analysis accounted for these and other factors. The omission of these factors from Contemporary's study affects only the weight of the evidence, however, and not its admissibility. Evidence need not be conclusive in order to be relevant. *North American Philips Co. v. Church*, 375 F.2d 93, 97 (2d Cir. 1967). Standing alone, the study tended to prove that it was more likely than not that "Fear No Evil" would be among the 51 percent of recordings that reached

the top 20. If Famous wished to offer proof that would tend to cast doubt on the accuracy of that prediction, it would be free to do so. In this way, all of the evidence tending to show the probable amount of Contemporary's damages would be placed before the jury. While it is true that the jury would be required to speculate to some degree with respect to whether "Fear No Evil" would be within any particular percentage, such is the nature of estimation. If the amount of damage were certain, no estimation would be required. But the uncertainty exists, and since it is a product of the defendant's wrongful conduct, he will not be heard to complain of the lack of precision. *Entis v. Atlantic Wire & Cable Corp., supra,* 335 F.2d at 763.[17]

Because *Freund* does not bar proof of lost royalties and because the proffered evidence was relevant on that issue, Fed.R. Evid. 401, Judge Owen was required to admit it, Fed.R.Evid. 402, unless he found that "its probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403. It may be, for example, that "[i]n the frame within which [they were sought to be] used . . . the [statistics], though relevant, became an item of prejudicial overweight." *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 511 & n.19 (2d Cir. 1977). Similarly, it may be that if Contemporary was unprepared to offer an analysis of factors other than the bare statistics, those statistics, standing alone, would be misleading and would therefore not provide a "stable foundation for a reasonable estimate of royalties" that would have been earned if Famous had not breached. *Freund v. Washington Square*

*Press, Inc., supra,* 34 N.Y.2d at 383, 357 N.Y.S.2d at 861, 314 N.E.2d at 421. Because Judge Owen did not reach these issues, and because we believe it would be inappropriate for this Court to engage in Rule 403 balancing in the first instance, the case must be remanded to the district court for the purpose of making a Rule 403 determination. The resolution of that issue will, in turn, determine whether Contemporary should be given the new trial on the issue of damages which it seeks on its cross-appeal.

The judgment of the district court is affirmed in all respects except as to its ruling with regard to lost royalties, and the case is remanded to the district court for further proceedings in accordance with this opinion.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

Although I concur with much that has been said in Judge Meskill's carefully researched opinion, there are several points on which I find myself in disagreement with my colleagues. The first of these concerns the contractual requirement for notice of breach, and the second involves the majority's remand for further consideration of an evidentiary ruling. I will address each of these briefly.

### Notice of Breach

When a businessman retains a lawyer to prepare a contract, he expects, and is entitled to expect, that the lawyer will incorporate such provisions therein as are necessary to protect his client's interests. Nothing is more frustrating to the conscientious lawyer than to painstakingly draft such provisions and then have a court brush them aside as "hypertechnical".

---

17. Judge Owen's ruling has produced some appellate uncertainty concerning whether the evidence was excluded as a matter of substantive contract law under *Freund* or as a matter of evidence under Fed.R.Evid. 402. Because Judge Owen relied upon the *Freund* case, and because the arguments addressed to this Court are made in terms of the *Freund* case, we treat his ruling as having been made on that basis. Nevertheless, because of the uncertainty, we wish to emphasize the distinct nature of these two determinations. The determination, under

*Freund,* of whether the *existence* of damage is certain or speculative, will always be influenced to some extent by the nature of the plaintiff's proof as to the *amount* of damage. Once it is determined that the existence of damage is certain, however, the certainty requirements of *Freund* should not be superimposed on Fed.R.Evid. 401 in determining the relevance of evidence as to amount. *See North American Philips Co. v. Church, supra,* 375 F.2d at 97.

The attorneys for appellant very carefully provided that no failure to perform should be termed a material breach unless appellee should first deliver to appellant "a written notice specifying the . . . alleged failure to act constituting such claimed material breach and [appellant] shall have failed to cure the material breach within thirty (30) days after receipt by [appellant] of such written notice." Where such a clause exists, it is settled law that there can be no recovery unless the notice provided for has been given. *Plumley v. United States*, 226 U.S. 545, 548, 33 S.Ct. 139, 57 L.Ed. 342 (1913); *National Telefilm Associates, Inc. v. Pamandia Productions, Inc.*, 42 A.D.2d 514, 344 N.Y.S.2d 418 (1st Dep't 1973); 10 N.Y. Jurisprudence *Contracts* § 293 (1960); 17A C.J.S. *Contracts* § 515, at 852–53 (1963). This rule of law assumes particular importance where, as here, a contract has been assigned and the assignor's obligations assumed, because the notice which it requires guarantees the assignor an opportunity to remedy a defect in performance about which the assignor might not otherwise know.

The notice relied on in this case consisted of a telegram followed closely by a letter. The telegram stated in substance that the sale to ABC constituted a breach of contract and that suit would be filed against ABC immediately. The District Court has held that the sale did not constitute a breach of contract, and my colleagues do not quarrel with this holding. The inventory of records was, of course, included in the sale, and plaintiff's statement that this transfer constituted an illegal seizure did not make it so. The letter stated that defendant had breached the contract in that it attempted to make a contract with ABC "creating an obligation or responsibility in behalf of or in the name of the Contemporary Mission." Defendant had done no such thing. It is clear, therefore, that neither the letter nor the telegram pointed to any breach of contract which the defendant was given a thirty-day opportunity to cure.

The majority opinion states that the letter and telegram placed defendant under a duty to communicate with ABC to "insure that the contract was being performed"; and, that "[h]ad it done so, it would have found" that it was not. This, however, was the very procedure that the thirty-day notice of default was designed to eliminate.[1] Without going into unpleasant details, the record shows that plaintiff's members were not naive recluses venturing timidly into the commercial world, but were aggressive entrepreneurs who were strangers to neither contract negotiations nor litigation. I see no reason why they should not be bound by the specific provisions of their contract in the same manner as would any other businessmen.

### Evidentiary Remand

Under the Federal Rules of Evidence, the trial judge continues to have wide discretion in his rulings, which will not be disturbed unless this discretion has been clearly abused. *United States v. Dwyer*, 539 F.2d 924, 927 (2d Cir. 1976). "Hardly anywhere does the inherent nature of an adversary trial commit so much to the careful, but wide and flexible, discretion of the trial judge as it does on questions of admissibility of evidence." 11 Wright & Miller, Federal Practice and Procedure § 2885, at 282 (1973).

Judge Owen gave thorough consideration to the plaintiff's exhibit which purported to show the sales history of some 324 records that were number 61 or better on the record chart during 1974. Indeed, he permitted plaintiff to put its vice president on the stand in the absence of the jury to attempt to lay a proper foundation for the exhibit's admission and exercised remarkable re-

---

1. It should also be noted that no written notice of any sort was given to the assignee. An assignee of a contract stands in the shoes of his assignor and acquires the assignor's rights thereunder. *Tambro Fabrics Corp. v. Deering Milliken, Inc.*, 35 A.D. 469, 471, 318 N.Y.S.2d 764 (1st Dep't 1971); *see In re S & L Vending Corp. v. 52 Thompkins Avenue Restaurant, Inc.*, 26 A.D.2d 935, 274 N.Y.S.2d 697 (2d Dept. 1966). The right to a thirty-day notice of default was such a contractual right.

straint during this procedure, in the face of conduct by the witness which bordered on the contemptuous. The testimony of the witness showed that the sales history of each record was dependent upon the reputation of the performing artist, the size and resources of the recording company, the quality of the music and recording and the speed with which the record rose on the record chart. The exhibit which plaintiff offered in evidence did not contain information as to any of these items. I see no abuse of discretion in the trial court's rejection of it.

Evidence which may be arguably relevant should not be admitted if it tends, as here, to mislead rather than enlighten the jury. *United States v. Costello*, 221 F.2d 668, 674 (2d Cir. 1955), *aff'd*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). This is particularly true where figures are summarized in documents which "have a way of acquiring an existence of their own, independent of the evidence which gave rise to them." *Holland v. United States*, 348 U.S. 121, 128, 75 S.Ct. 127, 131, 99 L.Ed. 150 (1954). Evidence should also be excluded which leads to possible confusion, *United States v. Harris*, 542 F.2d 1283, 1317 (7th Cir. 1976), or tends to prolong the trial or distract the jury into side issues, such as excursions into the detailed history of 324 unrelated recordings. *See Belmont Industries, Inc. v. Bethlehem Steel Corp.*, 512 F.2d 434, 439 (3d Cir. 1975). I am not sure that I understand what my colleagues are directing the District Court to do upon remand. My position simply is that there was no error in the trial court's ruling and there is therefore no necessity for any type of remand.

I agree with the majority that the question of liability as to the Virgin contract is a "close one", and, as a juror, I might well have reached a different conclusion than was reached below. However, I would affirm the judgment on the Virgin contract, both as to liability and amount. I would reverse so much of the judgment as awards damages under the Crunch agreement and such damages as are unallocated.