Barth David SCHWARTZ, Plaintiff,

v.

**FORTUNE MAGAZINE, a division of Time, Inc., Defendant.**

No. 98 CIV. 7444(RLC).

United States District Court, S.D. New York.

Dec. 16, 1999.

Lee Henig–Elona, Parker, Chapin, Flattau & Klimpl, LLP., New York City, for Plaintiff.

Paul G. Gardephe, Deputy General, Milton L. Williams, Jr., Assistant General, General Counsel's Office, New York City, for Defendant.

*OPINION*

ROBERT L. CARTER, District Judge.

This breach of contract action, filed by plaintiff Barth David Schwartz, is before the court on the motion of defendant FORTUNE Magazine, a division of TIME, Inc., ("FORTUNE") for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50(b). Plaintiff sued FORTUNE for allegedly vi-olating ¶ 17 and ¶ 32 of the contract the parties entered on August 1, 1997. A jury trial was held on plaintiff's claim and, at the close of plaintiff's case and at the close of the entire case, FORTUNE moved for judgment as a matter of law. In both instances decision was reserved, and the case was sent to the jury. The jury returned a verdict that defendant had breached ¶ 32 of the contract, and awarded plaintiff damages in the amount of $108,-000. (Ct. Tr. Ex. 4.). Defendant renewed its motion for a judgment as a matter of law and, for the reasons hereafter stated, the motion is granted.

I. *BACKGROUND*

In the spring of 1997, plaintiff wrote two letters to Michael Pepe, the group publisher of FORTUNE, expressing his interest in working for FORTUNE as an independent contractor selling special advertising sections to foreign nations. (Tr. 242.)[1] In April 1997, Pepe forwarded one of plaintiff's letters to P.J. Boatwright, FORTUNE's Director of Custom Projects, who was in charge of FORTUNE's special advertising projects and who negotiated FORTUNE's independent contractor agreements authorizing salespersons to work on special advertising sections.[2] (Tr. 55 & 58).

Plaintiff and Boatwright entered into a contract, dated August 1, 1997, that authorized plaintiff to act as a FORTUNE independent contractor and sell special advertising sections to foreign businesses and nations. (Pl.Ex. 19.) The contract provided that plaintiff would receive a 25% commission on the advertising orders he brought in, (Tr. 64), and that he could propose special advertising section ideas, and FORTUNE had thirty days to ap-

1. Tr. refers to the trial transcript from the November 30, 1999, trial. Ct. Tr. Ex. refers to the Court's Trial Exhibits generated during the November 30, 1999, trial. Pl. Tr. Ex. refers to Plaintiff's Trial Exhibits from the November 30, 1999, trial. Def. Tr. Ex. refers to Defendant's Trial Exhibits from the November 30, 1999, trial.

2. A special advertising section is a booklet that is published inside a magazine; the booklet features editorial copy highlighting the positive features of a company or industry, and allows advertisers from an industry or country to place their advertisements in a favorable promotional environment. (Tr. 55.)

prove or reject the sections. (Tr. 70–73.) It also provided that plaintiff was required to bear his own costs in soliciting the advertising orders. (*Id.*) Most important to the instant dispute, however, are the contract's two termination provisions: ¶ 17, which authorizes the cancellation of the individual special advertising sections FORTUNE had authorized plaintiff to pursue, and ¶ 32, which enumerates FORTUNE's and plaintiff's rights and responsibilities when terminating the entire independent contractor agreement.

Paragraph 17, the special advertising section cancellation provision, states,

"After FORTUNE has approved a section topic of publication, FORTUNE will not cancel the section unless there are no advertising orders in connection with the section. If your efforts to sell a section produce no advertising orders, then the section will be canceled and FORTUNE shall have no further obligation to you and you shall have no further obligation to FORTUNE in connection with that section topic."

Paragraph 32, the contract termination provision, states,

"This agreement may be terminated by either party with 30 days written notice. However, you shall complete any section projects you have been assigned before the contract termination will take effect."

FORTUNE authorized plaintiff to pursue thirty special advertising sections in the first few months of the contract, (Tr. 244–245 & 247), including projects for Mexico, Sweden, Hong Kong and Italy. (Tr. 70–71, 255.) Plaintiff never secured any advertising orders for the special advertising sections FORTUNE authorized him to pursue. (Tr. 201.)

During the winter of 1998, plaintiff informed Boatwright about his difficulty in getting advertising orders for the special advertising sections, and explained that FORTUNE's foreign office employees and independent contractors were resisting his efforts to secure orders. (Tr. 205–10.) In order to address this issue, Boatwright and plaintiff had a meeting on February 3, 1998, with Jolene Sykes, FORTUNE's publisher, during which they discussed how Schwartz might better bring in special advertising orders. (Tr. 212–217.) During the meeting, plaintiff suggested that he could do a better job for FORTUNE if he was given a full staff position, (Tr. 216), was put in charge of international special advertising sections, and was allowed to report to Sykes directly. (Tr. 107–09.) Boatwright rejected this idea. (*Id.*) Boatwright testified at trial that Sykes did not agree to hire plaintiff. (Id.) Plaintiff testified at trial that Sykes agreed that he should be hired as a staff member. (Tr. 217.)

After the meeting with Sykes, the two men returned to Boatwright's office, argued about whether plaintiff had acted inappropriately during the Sykes meeting, (Tr. 256), and ultimately began to try to negotiate an on-staff employment contract for plaintiff to work at FORTUNE selling special advertising sections. (*Id.*) Boatwright and plaintiff had at least two conversations prior to February 11, 1998, in which they negotiated whether plaintiff would join the FORTUNE staff; however, they failed to come to an agreement. (Tr. 111 & 262).

On the morning of February 12, 1998, Boatwright sent a messenger to plaintiff's hotel room with a one sentence letter, stating that plaintiff's contract with FORTUNE was terminated. (Tr. 248.) The same morning, plaintiff called Boatwright to find out what the letter meant, and Boatwright clarified that the letter was to inform plaintiff that he should do no further work for FORTUNE and that he should cancel all his sales appointments made on FORTUNE's behalf. (Tr. 228–29.) At trial, Boatwright testified that during this phone call he told plaintiff that the special advertising sections he was assigned were canceled and that the thirty day pretermination notice period required

under ¶ 32 of the contract had begun to run. (Tr. 113–14.) Plaintiff testified that Boatwright never explicitly stated that the sections were canceled, and instead said that the termination was effective February 12, 1998. (Tr. 229, 248).

Later on February 12, 1998, plaintiff called Pepe to inform him that Boatwright had terminated the August 1, 1997, contract. (Tr. 241.) Pepe called Boatwright, and Boatwright called plaintiff a second time, and apologized for having yelled at plaintiff in previous meetings, and offered him approximately $10,000 for expenses he had incurred while working for FORTUNE. (Tr. 262.) Plaintiff rejected Boatwright's offer, stated that his expenses had been $18,000, and indicated that the contract did not require FORTUNE to reimburse him for expenses. (Tr. 230–31 & 264–65.) After this conversation on February 12, 1998, plaintiff did not do any additional work for FORTUNE on the special advertising sections. (Tr. 277.)

Boatwright sent plaintiff another letter on March 5, 1998, explaining that the February 12, 1998, letter was intended to begin the thirty day pretermination notice period required under the contract, and to inform plaintiff again that he should not have been doing any work for FORTUNE after February 12, 1998. (Tr. 130–34.)

At trial, plaintiff testified that Boatwright's letters and phone calls caused him to cancel a series of March appointments that he had scheduled in Sweden to solicit orders for a potential special advertising section. (Tr. 225). Plaintiff also testified that he had appointments scheduled for February 13, 1998, in Washington D.C., at which he and Boatwright were supposed to meet embassy officials from several countries in which plaintiff had been authorized to pursue sections. (Tr. 228.) Plaintiff offered evidence of his damages, specifical-

ly, sales commissions he lost on the advertising sections for these countries, as well as commissions for other sections he had been authorized to pursue under the contract, but stopped working on after receipt of the termination letter. (Tr. 267–71.)

At trial, plaintiff contended that defendant breached two provisions of the August 1, 1997, contract: ¶ 17, because neither Boatwright's letter or his phone calls on February 12, 1998, cancelled the special advertising sections plaintiff was authorized to pursue under the contract, and therefore he should not have been required to stop work on these sections, and ¶ 32, because Boatwright's February 12, 1998, letter terminated the contract without giving him the thirty days pretermination notice required by the contract.

## II. ANALYSIS

■ Fed.R.Civ.P. 50(b) provides that when a jury returns a verdict for which there is not a legally sufficient evidentiary basis, the court may either order a new trial or direct the entry of judgment as a matter of law.[3] In reviewing this motion, the court "view[s] the evidence in the light most favorable to the party against which the motion [i]s made ... making all credibility assessments and drawing all inferences in favor of the non-movant." *Randall v. K–Mart Corp.*, 150 F.3d 210, 211 (2d Cir.1998) (internal citations and quotations omitted). The court will only issue a judgment as a matter of law when "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Cruz v. Local Union No. 3, Int'l Bd. of Elec. Workers,* 34 F.3d 1148, 1154–55 (2d Cir.

---

3. Defendant FORTUNE properly preserved its right to raise a motion for a judgment as a matter of law as defense counsel made a motion for a directed verdict at the close of plaintiff's case, and at the close of trial, and renewed its motion after the jury returned its verdict. *See Phillips v. Bowen*, 189 F.R.D. 50, 50 (N.D.N.Y.1999).

1994) (internal quotations and citations omitted). The court "must give deference to all credibility determinations and reasonable inferences made by the jury" and "it may not itself weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Vasbinder v. Ambach*, 926 F.2d 1333, 1339–40 (2d Cir.1991).

Although defendant has not challenged the jury's finding that it did not breach ¶ 17 of the contract, the court reviews this finding because it is inconsistent with and provides one explanation for why the jury's finding on plaintiff's second breach of contract claim is in error. The jury concluded that the trial evidence showed that ¶ 17 of the August 1, 1997, contract permitted FORTUNE to cancel the special advertising sections plaintiff was assigned if he had no advertising orders for the sections. (Ct. Tr. Ex. 4.) The jury's decision on this matter should not be disturbed if it is well supported by the trial evidence and New York state law. *See* Fed. R.Civ.P. 50. The court's review of the jury's decision indicates that the jury properly interpreted ¶ 17, because it gave the provision's language an ordinary and plain meaning, and it read the provision in a manner that allowed the jury to give full effect to all of the contract provisions. *See American Express Bank Ltd. v. Uniroyal Inc.*, 164 A.D.2d 275, 276–77, 562 N.Y.S.2d 613, 614 (1st Dep't.1990). Additionally, the trial evidence showed that plaintiff failed to secure any advertising orders for the special advertising sections he was assigned, and therefore the jury properly concluded that FORTUNE had the right under the contract to cancel all of plaintiff's special advertising sections.

█ Defendant challenges the jury's finding for plaintiff on his second claim, that FORTUNE breached ¶ 32 of the contract, which required FORTUNE to give him thirty days pretermination notice before terminating the contract. (Ct. Tr. Ex. 4.) In order to determine whether FORTUNE complied with the contract's pretermination notice provision, the jury should have primarily looked at the contract's language. *See Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 726 (2d. Cir.1992) (collecting cases holding parties to the duties clearly identified under the pretermination notice clauses in their contracts). However, courts have recognized that there is nothing to be gained by "constru[ing] [a] notice provision as if it were a common law pleading requirement under which every slip would be fatal." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 925 (2d Cir.1977). Rather, the law requires that the court look to see if defendant's actions in terminating a contract served the general purpose of the contract's pretermination notice provision. *See id.*

On review of the trial evidence, the court concludes that the jury erred in finding that defendant breached the pretermination notice provision of the August 1, 1997, contract. Boatwright, FORTUNE's agent, made several good faith attempts to terminate plaintiff's contract in accordance with ¶ 32's thirty day pretermination notice requirement. Boatwright sent plaintiff a letter on February 12, 1998, identifying the contract signatories and the date of the contract's effect, which stated: "this letter is to terminate the contract between you and FORTUNE." (Pl. Tr. Ex. 26.) The same day, Boatwright spoke to plaintiff twice, and clarified that the February 12, 1998, letter was intended to inform plaintiff that he should not to do anything further on behalf of FORTUNE, and that the contract was at an end.

Importantly, ¶ 32 of the contract only requires that plaintiff be given written pretermination notice; it is silent about what the written notice should say. Given ¶ 32's ambiguity, the court concludes that Boatwright's February 12, 1998, letter, when coupled with the phone conversations he had with plaintiff that day, were sufficient to inform plaintiff that the contract was coming to an end and that the pretermination notice period had begun. *See Carvel Corp. v. Diversified Manage-*

*ment Group Inc.*, 930 F.2d 228, 233 (2d Cir.1991) (recognizing that a corporation's letter setting forth pretermination notice information provided sufficient basis for subsequent termination of contract); *Contemporary Mission*, 557 F.2d at 925 (recognizing that a party's oral conversation with a defendant and subsequent letter misstating the basis for the 'alleged breach of contract which triggered the plaintiff's attempt to give pretermination notice was sufficient to satisfy plaintiff's contractual obligation to provide such notice).

■ Indeed, plaintiff's claim about the breach of the pretermination notice provision is based on an overly formalistic understanding of what FORTUNE was required to do in order to start the thirty day notice period running; all that was required was for defendant to make a good faith attempt to comply with the contract's termination provisions. *See Contemporary Mission*, 557 F.2d at 925. Plaintiff also attempted to prove that Boatwright exercised FORTUNE's right to terminate the contract because of malevolence, anger and other bad faith motivations: he presented evidence about his difficult meeting with Boatwright and Sykes, his arguments with Boatwright, and his failed attempts to negotiate a staff employment contract with Boatwright. However, these facts are irrelevant, as the court does not inquire into why a party exercised his right to terminate a contract when the contract is terminable without cause. *See Joseph Victori Wines, Inc. v. Vina Santa Carolina, S.A.*, 933 F.Supp. 347, 353 (S.D.N.Y.1996) (Connor, J.). Rather, the court's inquiry is limited to whether a party's actions in terminating the contract are consistent with the purposes described in the contract's termination provisions. *See Contemporary Mission*, 557 F.2d at 925. Plaintiff's letter on February 12, 1998, and his subsequent phone calls to plaintiff on that day were designed to serve the purposes of the pretermination provision: to inform plaintiff that he should stop work on projects for FORTUNE magazine, and that the contract was coming to an end. Additionally, Boatwright's March 5, 1998, letter further establishes that Boatwright attempted to terminate the contract in a manner that gave plaintiff adequate pretermination notice.

■ Even if the court assumes that the jury correctly determined that Boatwright breached the contract's pretermination notice provision, this does not end the court's inquiry, for a plaintiff must also show that the breach he suffered caused him damages in order to prevail on his breach of contract claim. *See First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998). The breach of a contract's pretermination notice provision can cause damages, particularly when the breach deprives the party entitled to notice of the opportunity to cure his breach of the contract. *See Bausch*, 977 F.2d at 726. The pretermination notice provision in plaintiff's contract offered no opportunity for cure; therefore, plaintiff either was required to show how the breach of the notice provision caused him expectancy damages or, to show that he should be reimbursed for the costs he incurred while performing under the contract. *See West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 A.D.2d 81, 87, 267 N.Y.S.2d 29 (1st Dept.1966).

■ Importantly, plaintiff's expectancy damages in this case, were severely limited by the jury's initial finding regarding his claim under ¶ 17, as the jury determined that FORTUNE was entitled to cancel the special advertising sections plaintiff was assigned but for which there were no orders. Since there were no advertising orders submitted before the date FORTUNE gave plaintiff notice that the contract was about to be terminated, the only expectancy damages plaintiff could pursue were commissions on advertisements that FORTUNE received during the thirty day pretermination notice period that were received as a result of plaintiff's past efforts to get advertising orders.

At trial, however, plaintiff failed to present any evidence that orders he had worked on previous to the thirty day notice period were accepted by FORTUNE during the months after he received his termination letter. Moreover, he did not provide evidence of the costs he incurred performing under the contract.[4] Since plaintiff presented no proof that he suffered any financial loss as a result of FORTUNE's alleged breach of the contract's pretermination notice provision, the jury's finding that he should be awarded $108,000 in damages for this breach was error. Given this finding, the jury's damage award must be set aside. *See Bausch,* 977 F.2d at 729 (explaining that the court cannot award damages that would place plaintiff in a better position than he would have been had the contract been fully performed).

In summary, the court finds that the jury properly concluded that FORTUNE did not breach ¶ 17 of the contract, and, as explained here, plaintiff failed to prove that FORTUNE breached ¶ 32 of the contract or to show that the alleged breach of ¶ 32 caused him damages. Therefore, both of plaintiff's breach of contract claims must fail. For these reasons, the court sets aside the jury's finding for plaintiff on his second breach of contract claim, and orders judgement for defendant FORTUNE as a matter of law on both claims.

IT IS SO ORDERED.

---

4. Plaintiff merely asserted at one point during his testimony that he spent $18,000 while performing under the contract. However, he offered no specific itemized proof of these expenses at trial. Rather, this testimony was devoted to his explanation of why he rejected FORTUNE's offer to compensate him for the efforts he had made on its behalf. (Tr. 230–31 & 264–65).