USI INSURANCE SERVICES LLC, as Successor-in-interest to USI Northeast, Inc., Plaintiff,

v.

Jeffrey MINER, et al., Defendants.

Jeffrey Miner, Counterclaim–Plaintiff,

v.

USI Insurance Services LLC, as Successor-in-interest to USI Northeast, Inc., Counterclaim–Defendant.

No. 10 Civ. 8162(LAP).

United States District Court, S.D. New York.

July 7, 2011.

Laurent Scott Drogin, Tarter Krinsky & Drogin LLP, New York, NY, for Plaintiff.

Diane E. Sammons, Bruce Heller Nagel, Nagel Rice, L.L.P., Roseland, NJ, Robert H. Solomon, Leboeuf, Lamb, Leiby & MacRae, New York, NY, for Defendants.

*MEMORANDUM & ORDER*

LORETTA A. PRESKA, Chief Judge:

This action concerns numerous claims, counterclaims, and third-party claims arising out of Defendant Jeffrey Miner's ("Miner") departure from employment with Plaintiff USI Insurance Services LLC ("USI") on October 20, 2010, to begin work for USI's business competitor, Insurance Office of North America ("IOA"). The parties now move for partial summary judgment on a number of discrete issues. USI seeks rulings that, as a matter of law: (1) Miner failed to comply with the Notice–of–Breach provision of Section 4.2 of his September 30, 2003 Employment Agreement ("Employment Agreement") with USI; (2) Miner solicited his former USI clients in violation of Section 7.1 of the Employment Agreement; and (3) Miner failed to give proper notice of the termination of his employment pursuant to Section 8.3 of the Employment Agreement. In turn, Miner and IOA ("Defendants") seek rulings that, as a matter of law: (1) the restrictive covenants contained in the Employment Agreement and Miner's September 30, 2003 Asset Purchase Agreement ("APA") with USI are unenforceable and that USI has failed to show irreparable harm; (2) the information Miner allegedly misappropriated was not confidential; (3) USI is not entitled to injunctive relief because of its delay in seeking such relief; and (4) USI breached the Employment Agreement. Additionally, Defendants cross-move for a ruling that Miner did not solicit USI clients. By Orders dated July 1, 2011, and July 5, 2011, the Court GRANTED in part and DENIED in part

the parties' motions and cross-motions for partial summary judgment. [dkt. nos. 63, 64] The reasons underlying those rulings are set forth below.[1]

## I. Discussion

### A. Legal Standard

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing language of previous Rule 56(c)). The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *see also FDIC v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). When making this determination, a court must review the record in the light most favorable to the non-moving party and draw all reasonable inferences in his or her favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 253 (2d Cir.2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lucente,* 310 F.3d at 253 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

To survive summary judgment "the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita Elec. Indus. Co.,* 475 U.S. at 586 n. 11, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations, conjecture, and speculation, however, are insufficient to create a

---

1. In deciding the parties' motions and cross-motions for partial summary judgment, the Court considers the following submissions: USI's June 23, 2011 Letter re: enforceability of the Employment Agreement ("USI June 23 Letter"); Miner's June 24, 2011 Letter re: enforceability of the Employment Agreement ("Miner June 24 Letter"); USI's June 24, 2011 Letter re: Miner's failure to comply with the Section 4.2 Notice–of–Breach Provision ("USI June 24 Letter re: 4.2 Notice"); Miner's June 28, 2011 Letter in Opposition to USI's motion that Miner did not comply with the Section 4.2 Notice–of–Breach provision ("Miner June 28 Opp. Letter re: 4.2 Notice"); USI's June 29, 2011 Reply Letter re: Miner's failure to comply with the Section 4.2 Notice–of–Breach Provision ("USI June 29 Reply Letter re: 4.2 Notice"); USI's June 28, 2011 Opposition Letter re: Enforceability of Restrictive Covenants ("USI June 28 Opp. Letter re: Restrictive Covenants"); Miner's June 29, 2011 Reply Letter re: Enforceability of Restrictive Covenants ("Miner June 29 Reply Letter re: Restrictive Covenants"); USI's June 28, 2011 Letter re: Evidence of Solicitation ("USI June 28 Letter re: Solicitation"); Miner's June 29, 2011 Opposition Letter re: Evidence of Solicitation ("Miner June 29 Opp. Letter re: Solicitation"); USI's June 30, 2011 Reply Letter re: Solicitation ("USI June 30 Reply Letter re: Solicitation"); Miner's June 28, 2011 Letter re: Confidential Information ("Miner June 28 Letter re: Conf. Info."); USI's June 29, 2011 Opposition Letter re: Confidential Information ("USI June 29 Opp. Letter re: Conf. Info."); Miner's June 30, 2011 Reply Letter re: Confidential Information ("Miner June 30 Reply Letter re: Conf. Info."); USI's June 28, 2011 Opposition Letter re: USI's Undue Delay ("USI June 28 Opp. Letter re: Undue Delay"); Miner's June 29, 2011 Reply Letter re: USI's Undue Delay ("Miner June 29 Reply Letter re: Undue Delay"); Miner's June 29, 2011 Opposition Letter re: Section 8.3 Notice ("Miner June 29 Opp. Letter re: Section 8.3"); USI's June 30, 2011 Reply Letter re: Section 8.3 Notice ("USI June 30 Reply Letter re: Section 8.3"); Miner's June 28, 2011 Letter re: USI's Breach of Employment Agreement ("Miner June 28 Letter re: USI Breach"); USI's June 29, 2011 Opposition Letter re: USI's Breach of Employment Agreement ("USI June 29 Opp. Letter re: USI Breach"); Miner's June 30, 2011 Reply Letter re: USI's Breach of Employment Agreement ("Miner June 30 Reply Letter re: USI Breach"); Miner's July 1, 2011 Letter re: December 11, 2009 Email.

genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. . . . [A] district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993).

### B. Analysis

#### 1. Miner's Failure to Provide Notice of Breach Under Section 4.2 of the Employment Agreement

USI asserts that Miner cannot allege that USI breached the Employment Agreement with regard to Miner's compensation because Miner failed to comply with the notice provision contained in Section 4.2 of the Employment Agreement. While acknowledging that he did not strictly comply with the notice requirement, Miner asserts that New York law only requires substantial compliance, and he asserts he did so. For the following reasons, USI's motion for partial summary judgment is GRANTED.

Section 4.2 of the Employment Agreement governs Miner's compensation, including annual "true-ups," [2] and includes a notice provision providing that "[n]either party shall be deemed to have breached the covenants contained in this Section 4.2 unless it has failed to have cured a default of the provisions of this Section 4.2 within (15) days of being notified in writing of

such default." Further, Section 12.1 of the Employment Agreement requires that:

[a]ll notices, demands and requests of any kind which either party may be required or may desire to serve upon the other party hereto in connection with this Agreement shall be delivered only by courier or other means of personal service, which provides written verification of receipt, or by registered or certified mail with return receipt requested, or by telecopy, provided that the telecopy is promptly followed by delivery of hard copy of such notice which provides written verification of receipt (each, a "Notice").

■■■ Generally, "[s]uch written notice requirements are fully enforceable." *Art of War Music Publ'g, Inc. v. Andrews,* No. 98 Civ. 6034, 2000 WL 245908, at *2 (S.D.N.Y. Mar. 3, 2000). Notice provisions, such as the one here, "serve the valuable function of allowing the purportedly breaching party to distinguish between minor complaints or posturing by its contractual partner and an actual threat of termination." *Id.* Under New York law, where no notice was given as set forth under the Employment Agreement, there can be no breach of the Employment Agreement because defendant was not afforded the opportunity to cure the defect. *See, e.g., Needham v. Candie's, Inc.,* No. 01 Civ. 7184, 2002 WL 1896892, at *3 (S.D.N.Y. Aug. 16, 2002) (holding that no notice, or chance to cure, was provided as required under the agreement, and thus there was no breach); *Point Prods. A.G. v. Sony Music Entm't, Inc.,* No. 93 Civ. 4001,

---

**2.** Pursuant to the Employment Agreement, Miner received a $400,000 annual draw against his commissions. (*See* USI's June 29 Reply Letter re: 4.2 Notice at 2.) At the end of each calendar year, the Company compared the commissions achieved with Miner's annual draw. USI refers to these annual comparisons as "true-ups." (*Id.* at 3.) Therefore, it is

more appropriate to view the commissions as credits to Miner. As a simple example, if Miner received $100,000 of his annual draw in the first quarter and only earned $50,000 in commissions during that quarter, he would not be entitled to any additional compensation. Rather, Miner would be required to remit the amount of $50,000 to USI.

2000 WL 1006236, at *3 (S.D.N.Y. July 20, 2000) (same); *Karabu v. Pension Benefit Guar. Corp.*, No. 96 Civ. 4960, 1997 WL 759462, at *8 (S.D.N.Y. Dec. 10, 1997) (same); *Rebh v. Lake George Ventures, Inc.*, 223 A.D.2d 986, 986, 636 N.Y.S.2d 504 (N.Y.App.Div.1996) (same); *Absolute Direction, Inc. v. Anderson*, 201 A.D.2d 256, 256, 607 N.Y.S.2d 25 (N.Y.App.Div.1994) (same).

The Court of Appeals has cautioned, however, that in certain limited circumstances, courts should not "construe the notice provision as if it were a common law pleading requirement under which every slip would be fatal." *See Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 925 (2d Cir.1977) (holding that where a party had provided written notice of a material breach as to one contract provision that was not the ultimate basis for recovery, it would be "hypertechnical to upset the verdict on the ground that the notice was insufficient").

■ Here, Miner concedes that he did not satisfy the formal notice requirements under the Employment Agreement. Instead, Miner proffers that his course of conduct was adequate to place USI on notice that he believed it had breached the Employment Agreement. Accordingly, the Court now turns to Miner's contention that he substantially complied with the notice provision by sending emails and having conversations with Jonathan D'Elia, the President of USI Northeast; Rosaleen Pizarro, USI Northeast's Regional Accounting Manager; Mike Voltag-

gio, USI's Regional CFO; and Jim Butler, USI's Regional CEO. After a careful review of the record, the Court finds that Miner failed to satisfy the notice provision under Section 4.2 of the Employment Agreement.

Miner first relies upon a limited number of emails to show that he substantially complied with the Section 4.2's notice requirement.[3] On December 11, 2009, Mr. Voltaggio emailed Miner concerning his true-up calculations for the time period relevant to this lawsuit. (Miner June 28 Opp. Letter re: 4.2 Notice, Declaration of Greg M. Kohn, Esq. ("Kohn Decl."), dated June 28, 2011, Ex. B.) Mr. D'Elia and Ms. Pizarro were copied on this email as well. In the email, Mr. Voltaggio stated that based upon these calculations, Miner was currently in a deficit position of approximately $82,000. He further wrote that he understood Miner had a significant amount of "premier property renewals" that when paid would offset part of this deficit position. Mr. Voltaggio suggested that they set up a meeting in January to conduct "a full year 2009 true-up" review. On the same day, Miner replied to all and wrote, "Waiting to January is [f]ine." (*Id.*) Miner further remarked that he believed "there are significant flaws to your calculation . . . which we can discuss in January." He informed Mr. Voltaggio that he would begin to "revue [sic] the numbers and forward a list of issues ahead of time, so we are all on the same page." (*Id.*) On December 14, 2009, Miner emailed Mr. Voltaggio, copying Mr. D'Elia and Ms. Pizar-

---

3. In his initial submission, Miner relied principally upon a purported email that he alleges he sent on December 11, 2009 to Robert Myers, the Senior Vice President of Property and Casualty for USI, Jonathan D'Elia, and Rosaleen Pizarro. (*See* Miner June 28 Opp. Letter re: 4.2 Notice, Ex. A.) At that time, Miner argued that this email alone was sufficient to establish notice. (*See id.* at 6 ("This

alone substantially complies with the notice provision of the Employment Contract.")) USI subsequently disputed the authenticity of the email. (*See* USI June 29 Reply Letter re: 4.2 Notice at 3–6.) During a July 1, 2011 conference call with all parties, Miner stated that he was withdrawing the December 11, 2009 e-mail from the Court's consideration. Accordingly, the Court does not consider it.

ro, and wrote "Mike, Two more items for the list ... I thought of these on the way in this morning and needed to write them down before I forgot." (Miner June 28 Opp. Letter re: 4.2 Notice, Kohn Decl., Ex. C.) On July 27, 2010, Ms. Pizarro emailed Miner stating "[a]ttached is your 2Q True-up for your review and to provide comments on Thursday. Thanks!" (Miner June 28 Opp. Letter re: 4.2 Notice, Kohn Decl., Ex. D.) Miner replied with an inquiry about two specific accounts and asked for an explanation of the breakdown of commissions from these two accounts. (*Id.*) Miner also submits Ms. Pizarro's notes from an August 2, 2010 meeting with Miner. (Miner June 28 Opp. Letter re: 4.2 Notice, Kohn Decl., Ex. E.) The notes reflect only that the parties discussed many different accounts and either noted that "no follow up was needed" or that Miner or USI needed to follow up on certain items. (*Id.*)

Miner also proffers deposition testimony from Mr. D'Elia, Mr. Voltaggio, Ms. Pizarro, and Mr. Butler to demonstrate that USI was on actual notice that Miner believed the Agreement was breached. Miner asserts that the testimony shows that USI knew that Miner was owed commissions and that USI was afforded the opportunity to cure the defects and refused to do so. Miner's characterization of the testimony is inaccurate.

At Mr. D'Elia's deposition, counsel asked, "[a]nd did you understand at the time that [Miner] was upset about the way his true-ups were calculated?" He answered "No. At that time I wouldn't have characterized my understanding of [Miner's] view of things as being upset. I'd been there a month, but I would characterize it as being concerned." (Miner June 28 Opp. Letter re: 4.2 Notice, Kohn Decl., Ex. G, D'Elia Dep. 35:3–9.) Further, Mr. D'Elia testified repeatedly that he was un-

able to comment on the details of the actual accounts because Miner never sent the information to USI that USI required to complete the evaluation. (*Id.* 69:2–6; 70:12–19.) Similarly, Ms. Pizarro testified that she did not believe Miner was upset or angry concerning his true-ups. (Miner June 28 Opp. Letter re: 4.2 Notice, Kohn Decl., Ex. H, Pizarro Dep. 60:18–20.) Mr. Voltaggio testified only that he became aware that Miner had "disputed issues with the numbers in his true-up." (Miner June 28 Opp. Letter re: 4.2 Notice, Kohn Decl., Ex. I, Voltaggio Dep. 68:19–20.) Mr. Butler testified that sometime in 2009 he first became aware that there were issues related to Miner's true-up and that the finance department was working through those issues. (Miner June 28 Opp. Letter re: 4.2 Notice, Kohn Decl., Ex. J, Butler Dep. 27: 10–13.) He also testified that he heard rumors that Miner may have been contemplating leaving USI. (*Id.* 88:2–10.) Mr. Butler spoke to Miner sometime in the summer of 2010, and Miner told Mr. Butler he was unhappy about his prospects to receive more equity in the firm. Further, Mr. Butler testified that he remembered Miner's describing his difficulties with his true-up calculations as a "nuisance." (*Id.* 89:5–16.)

None of this testimony, even taken together, supports Miner's argument that USI was aware that Miner considered any alleged discrepancies to be a breach of the Employment Agreement. To the contrary, the record reveals that USI and Miner were cooperatively working to determine Miner's true-ups. At no point did Miner ever mention that he believed a "breach" had occurred or that he would "sue" USI. Instead, the conversations are cordial and constitute the normal to-ing and fro-ing of working through complaints as to specific clients and commissions. As the emails demonstrate, Miner was satisfied to wait more than a month to meet

with his superiors at USI to review the commission reports. As noted above, the purpose of the notice provision is to separate minor complaints or disputed issues from the more serious allegations that a breach of contract has occurred. *See Art of War Music Publ'g*, 2000 WL 245908, at \*2. None of Miner's communications afforded USI such notice here. Moreover, the record shows that USI was not afforded a real opportunity to cure the alleged defect under Section 4.2. (*See* Miner June 28 Opp. Letter re: 4.2 Notice, Kohn Decl., Ex. G, D'Elia Dep. 69:2–4 ("We never completed Jeff's true-up. We never got the information we needed from Jeff to get agreement to have him sign-off on the true-up.").)

■ Furthermore, the Court must give effect to all of the provisions of a contract, and an interpretation that renders a term superfluous or meaningless is avoided if possible. *LaSalle Bank N.A. v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir.2005). Miner's position would render superfluous the notice provision under Section 4.2.

This holding does not require an overly formulistic application of the notice provision. *See Contemporary Mission, Inc.*, 557 F.2d at 925. In *Contemporary Mission*, plaintiff sent a letter to defendant stating that it considered the contract to have been materially breached and directed defendant to "Paragraph 12, among others" of the contract. *Id.* Ultimately, paragraph 12 was not the basis for plaintiff's recovery, and defendant argued that notice was therefore insufficient because plaintiff failed to cite to the exact provision of the contract. *Id.* The Court of Appeals rejected this "hypertechnical" argument. *Id.* This is far different from the facts proffered here. The record here is devoid of any statements by Miner to USI indicating that Miner believed there was a breach of the Employment Agreement or that he was triggering the provisions under the Employment Agreement that would allow USI an opportunity to cure any alleged defects. At no point did Miner inform anyone that he believed USI was in breach of Section 4.2. Nor did Miner indicate that he was prepared to sue USI or otherwise pursue a legal, as opposed to an amicable, remedy for his complaints.

For all these reasons, the Court concludes that Miner failed to provide adequate notice under Section 4.2 of the Employment Agreement. Accordingly, USI's motion for a ruling that Miner failed to give proper notice under Section 4.2 of the Employment Agreement is GRANTED.

2. USI's Breach of the Employment Agreement

Next, Miner seeks a ruling that USI breached Section 4.2 of the Employment Agreement. Miner asserts that USI breached the Employment Agreement (1) by failing to provide him true-ups as required under the Employment Agreement and (2) by failing to pay him the commissions owed with regard to the North Beach account. As discussed above, Miner failed to provide notice under Section 4.2, which is required to trigger the contractual remedy under Section 4.2. Because he failed to provide notice, USI never had the opportunity to cure the alleged defect, and therefore could not have breached Section 4.2. Accordingly, Miner's motion is DENIED. Miner's counterclaims against USI based upon alleged violations of Section 4.2 of the Employment Agreement are DISMISSED with prejudice.

3. Miner's Failure to Provide Notice of Termination Under Section 8.3 of the Employment Agreement

USI similarly seeks a ruling that Miner breached the Employment Agreement. It argues that he resigned on October 20,

2010, without providing thirty days written notice as required under Section 8.3 of the Employment Agreement.

 In New York, the terms of a written contract define the rights and obligations of the parties to the contract unless public policy or statutory authority dictates otherwise. *Abiele Contracting, Inc. v. N.Y. City Sch. Constr. Auth.*, 91 N.Y.2d 1, 666 N.Y.S.2d 970, 689 N.E.2d 864, 867 (1997). A court's fundamental objective in interpreting contract terms is to give effect to the intention of the parties as expressed in the unambiguous language of the agreement. *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir.2000) (citing *Breed v. Ins. Co. of North Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)).

 Section 8.3 of the Employment Agreement unequivocally required Miner to give USI "not less than thirty (30) days prior written notice" of his intent to terminate his employment. It is undisputed that on October 20, 2010, Miner sent an email to Jim Butler and Jonathan D'Elia of USI in which he stated, "I hereby formally tender my resignation *effective immediately.*" (*See* USI June 28 Letter re: Solicitation, Ex. D (emphasis added).) Miner commenced working for IOA on the same day. Miner asserts, however, that summary judgment is inappropriate because an issue of fact remains regarding whether USI breached the Employment Agreement first by failing to pay him his earned commissions in a timely manner or by providing his true-ups. It is Miner's theory that in the face of the alleged breach, he had no obligation to honor Section 8.3's thirty-day notice provision. (*See* Miner June 29 Opp. Letter re: Solicitation at 2–3.) Miner is mistaken. As discussed above, because Miner failed to provide notice under Section 4.2 of the Employment Agreement, USI never had the opportunity to cure any alleged defects and therefore could not have breached Section 4.2.

 Moreover, Miner's argument does not raise an issue of material fact sufficient to defeat summary judgment. Even if USI had failed to pay Miner his commissions or true-ups in a timely manner, as a matter of law neither breach would be material. Unless a breach is material, the obligations of a counterparty to a contract remain effective. As the Court of Appeals made clear, for a breach to be material under New York law it must be "willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Septembertide Pub., B.V. v. Stein and Day, Inc.* 884 F.2d 675, 678 (2d Cir.1989) (quoting *Callanan v. Powers*, 199 N.Y. 268, 92 N.E. 747, 752 (1910)). At most, USI's limited failure to credit Miner some commissions on time or provide him with timely true-ups constituted a miscalculation on USI's part and cannot, in any light, be viewed as a breach that went to the "root of the agreement between the parties." *Id.* (citing *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir.1980)). Rescission is an extraordinary remedy that is clearly unwarranted here. Miner has made no showing that USI's alleged failure to make payments was in any way willful. Therefore, Miner cannot escape his obligations under the Employment Agreement.

Because no issue of material fact exists as to the materiality of any alleged USI breach, summary judgment is appropriate. *Cf. Hosel & Anderson, Inc. v. ZV II, Inc.*, No. 00 Civ. 6957, 2001 WL 392229, at *1 (S.D.N.Y. Mar. 21, 2001) (summary judgment appropriate when there is no issue of material fact as to an affirmative defense). Miner had the obligation to provide notice of his termination irrespective of USI's alleged non-material breach. Given Min-

er's October 20, 2010 email terminating his employment "effective immediately," the Court finds that Miner breached Section 8.3 of the Employment Agreement. Accordingly, USI's motion is GRANTED.

### 4. Enforceability of Restrictive Covenants

The Court next addresses whether the restrictive covenants contained in the Employment Agreement are unenforceable. Defendants challenge the enforceability of the restrictive covenants on four grounds: (1) USI's restrictive covenants do not protect any legitimate interests; (2) the covenants are overly broad; (3) Miner has not misappropriated any trade secrets or confidential information; and (4) Miner's services are not unique or extraordinary. Additionally, Defendants seek a ruling that USI suffered no irreparable harm. USI asserts that the covenants are valid and that it is entitled to injunctive relief. For the following reasons, Miner's motion on these issues is DENIED.

At issue here are three restrictive covenants in which Miner agreed that he would refrain from: (1) soliciting former and active prospective USI clients ("Non–Solicitation Agreement"); (2) using or willfully disclosing confidential information ("Confidentiality Agreement"); and (3) soliciting or hiring USI employees ("Employee Non–Solicitation Agreement").[4] Section

---

**4.** In its June 23, 2011 letter to the Court, USI acknowledged that it was no longer seeking to prevent Miner from working for IOA.

**5.** The Employment Agreement defines "Confidential Information" as "any proprietary information ... that is not already available to the public" for clients and Active Prospective Clients and which includes in part:
(a) the identity of any client;
(b) information about key contacts at each client;
(c) servicing costs for any client; ...

---

7.1 of the Employment Agreement provides in part:

> Employee agrees that Employee will not, directly or indirectly, (a) solicit, sell, service, manage, provide, or accept any request to provide, or induce the termination, cancellation or non-renewal of, any USI business from or by any person, corporation, firm or other entity: (i) whose account constituted a Client Account of the Prospective Client of the Company ... or (b) solicit, offer, negotiate or otherwise seek to acquire any interest in any Active Prospective Acquisition of the Company ... throughout the Term hereof and thereafter until two (2) years after the effective date on which Employee's employment with the Company ... terminates.

Section 7.1 of the Employment Agreement provides in part:

> Employee will not directly or indirectly, (i) solicit the employment, consulting or other services of any other employee or independent producer of the Company . . . .

Finally, Section 6.3 of the Employment Agreement provides in part:

> [F]ollowing termination of Employee's employment with the Company ... Employee will not use, or willfully disclose to any Person, any Confidential Information ... of the Company ... [absent] the prior written consent of the Company . . . .[5]

(f) the specific insurance policies purchased by any client;
(g) the expiration dates, rates, fees, and premiums paid by any client;
(h) the risk specifications and claims loss histories of any clients;
(i) the nature of programs and plans, funding and administration, demographic characteristics and any other information supplied by, or developed for, any clients; ...
(k) financial information, including information set forth in internal records, files and ledgers, or incorporated in profit and loss

■ To determine whether a post-employment covenant is specifically enforceable under New York law, courts have adopted the prevailing common law reasonableness standard. *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220, 1223 (1999); *see also Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 70 (2d Cir.1999). The New York Court of Appeals expounded the reasonableness standard as follows:

> The modern, prevailing common-law standard of reasonableness for employee agreements not to compete applies a three-pronged test. A restraint is reasonable only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public.

*BDO,* 690 N.Y.S.2d 854, 712 N.E.2d at 1223 (emphasis in original). In applying this standard, "[c]ourts must weigh the need to protect the employer's legitimate business interests with the employee's concern regarding the possible loss of livelihood, a result strongly disfavored by public policy in New York." *Estee Lauder Cos. Inc. v. Batra,* 430 F.Supp.2d 158, 177 (S.D.N.Y.2006) (citation omitted). "Trade secrets and confidential information count among employer interests courts recognize as 'legitimate.'" *IBM Corp. v. Visentin,* No. 11 Civ. 399, 2011 WL 672025, at *8 (S.D.N.Y. Feb. 16, 2011) (citing *Reed, Roberts Assocs., Inc.,* 386 N.Y.S.2d 677, 353

N.E.2d at 593). "In addition injunctive relief may be available where an employee's services are unique or extraordinary and the covenant is reasonable." *Reed, Roberts Assocs., Inc. v. Strauman,* 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590, 593 (1976). The Court discusses each of the three prongs in order to determine whether the restrictive covenants at issue here are unenforceable.

### a. Whether the Agreement Is Overbroad

Miner asserts generally that the restrictive covenants do not serve a legitimate purpose because the "primary purpose of [USI's] restrictive covenants is to retain employees." (*See* Miner June 24 Letter at 8, n. 5.) USI in turn seeks to enforce the Non–Solicitation, Employee Non–Solicitation, and Confidentiality Agreements contained in the Employment Agreement and the APA.[6] For the reasons set out below, Miner has not carried his burden of demonstrating the absence of any material issues of fact concerning the enforceability of the restrictive covenants.

■ Under New York law, an employer "has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." *BDO,* 690 N.Y.S.2d 854, 712 N.E.2d at

---

statements, fiscal reports and business plans; ...

(n) all internal memoranda and other office records, including electronic and data processing files and records.

(Employment Agreement ¶ 1.1(a)-(c), (f)-(i), (k), (n).)

**6.** In his briefing, Miner fails to offer an explanation as to why the Employee Non-solicitation Agreement should be unenforceable. In his June 24 letter, Miner simply asserts with-

out citation to the record that "none of the USI employees in question resigned." While this may or may not be true, it has no bearing on whether the Employee Non-solicitation Agreement itself is enforceable as a matter of law. Accordingly, because the Miner has offered no further arguments on this issue, the Court will limit the remainder of its discussion here to the Non–Solicitation and Confidentiality Agreements.

1225. Here, USI first seeks to enjoin Miner for a period of twenty-four months from soliciting or servicing those USI accounts, previously serviced by USI that have moved their business to IOA as well as accounts that have remained with USI or that were active prospective clients as of Miner's termination. In *BDO*, the New York Court of Appeals considered this exact issue and held that an employer has a legitimate interest in preventing former employees from exploiting customer goodwill. *See BDO*, 690 N.Y.S.2d 854, 712 N.E.2d at 1225. Miner relies on *Visentin* for the proposition that USI's use of the restrictive covenants as "retention devices" undercuts the legitimate business purpose of the restrictive covenants. The Court in *Visentin*, however, made clear that whether the restrictive covenants were used as retention devices was only one of a number of factors that courts consider when making a case specific analysis. 2011 WL 672025, at *22. Furthermore, in *Visentin*, the former employee was subject to punitive financial clawback provisions upon his departure. Additionally, the architect of the employer's noncompetition program testified that the employer considered the non-competition agreements at issue there to be "retention devices." [7] *Id.* Miner has not proffered any similar facts here. Moreover, unlike in *Visentin*, USI is not presently seeking to preclude Miner from continuing to work at IOA. Even if the restrictive covenants are found to be facially reasonable, Miner would still be free to service and solicit any non-USI clients not identified in the parties' agreement. Accordingly, Miner has failed to show the absence of a potentially protectable legitimate interest here.

Miner next asserts that the Non–Solicitation Agreement is overbroad because it "would prohibit Miner for 24 months from accepting business from former clients who voluntarily and without any solicitation choose to continue to do business with Miner." *See* Miner June 24 Letter at 8.[8] However, courts addressing similar twenty-four month restrictions on solicitation of former clients in the insurance industry have found them to be reasonable. *See Marsh U.S.A. Inc. v. Karasaki*, No. 08 Civ. 4195, 2008 WL 4778239, at *16 (S.D.N.Y. Oct. 31, 2008) (citing *Willis of N.Y., Inc. v. DeFelice*, 299 A.D.2d 240, 750 N.Y.S.2d 39, 41–42 (N.Y.App.Div.2002)) (holding that a twenty-four month non-solicitation agreement for a high-level insurance broker was reasonable); *see also Chernoff Diamond & Co. v. Fitzmaurice*, 234 A.D.2d 200, 651 N.Y.S.2d 504, 505 (N.Y.App.Div.1996) (holding that a two-year restrictive covenant prohibiting an insurance agent's solicitation of former clients was not "unduly burdensome").[9] Miner cites *Leon M. Reimer & Co. v. Cipolla*, 929 F.Supp. 154, 158–59 (S.D.N.Y. 1996), for the proposition that courts routinely find such covenants to be unreasonable and unenforceable. The agreement in *Cipolla*, however, required the employee to "reimburse [the employer] for all fees earned from [any former] clients." See *id.* at 158. Determining whether a restrictive covenant is no greater than necessary to protect a party's legitimate interests is a case-specific inquiry, and because there is

---

7. Miner's general references to USI's desire to "promote company loyalty" are not persuasive.

8. Notably, this argument does not address the Employee Non–Solicitation Agreement or the Confidentiality Agreement.

9. Even if the Court were to find the twenty-four month limitation unreasonable, the Employment Agreement would still permit the Court to "blue-pencil" the terms of the restrictive covenant. (Employment Agreement Section 15.1.)

no such "clawback" requirement at issue here, Miner's citation to *Cipolla* is inapposite. Again, Miner has failed to show that the Non–Solicitation Agreement is overbroad.

Similarly, USI has a legitimate interest in seeking the return of any trade secrets or confidential information as defined in the Employment Agreement.[10] *See Visentin,* 2011 WL 672025, at *8. Under New York law, the customer information USI seeks to protect here can constitute "confidential customer information." *See John Hancock Mut. Life. Ins. Co. v. Austin,* 916 F.Supp. 158, 165 (N.D.N.Y.1996) (noting that "the papers and records in question were not mere customer lists. In addition to customer names, these papers contained information involving customer coverage, premium amounts, cash values, and loans against existing policies" and that such information "rises to the level of 'confidential customer information' under *Reed.*"); *see also Reed, Roberts Assocs., Inc.,* 386 N.Y.S.2d 677, 353 N.E.2d at 593. As discussed in Part I.B.6, [n. 20], *infra,* USI has proffered an email Miner sent from his USI account to his personal email account containing an eleven-page spreadsheet containing the names of dozens of companies with columns of what appears to be their financial information. The fact-finder might well conclude that that document contained trade secrets or confidential information as defined in the Employment Agreement, in which case the Confidentiality Agreement would be enforceable. Thus, Miner has failed to show that there is no material issue of fact regarding the enforceability of the Confidential Agreement.

Finally, Miner asserts that his own skills are neither unique nor extraordinary. *See* Miner June 24 Letter, at 8. In Section 9.1 of his Employment Agreement, however, Miner specifically acknowledged that his services "are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such services." (Employment Agreement, Section 9.1.) This alone creates a factual issue about the uniqueness of his services. Even if this were not the case, the question of whether one's services are unique is case-specific. In *Ticor Title,* the Court of Appeals made clear that "[a]n employer has sufficient interest in retaining present customers to support an employee covenant where the employee's relationship with the customers is such that there is a substantial risk that the employee may be able to divert all or part of the business." 173 F.3d at 72 (citing *Service Sys. Corp. v. Harris,* 41 A.D.2d 20, 341 N.Y.S.2d 702, 705–06 (N.Y.App.Div. 1973) (further noting that "[c]ustomer relationship is a very important factor in determining whether the covenant will be supported by the courts")); *see also Unif. Rental Div., Inc. v. Moreno,* 83 A.D.2d 629, 441 N.Y.S.2d 538, 539 (N.Y.App.Div. 1981) (upholding a two-year restrictive covenant as reasonable where an employee was held to be a "star" salesman). That certain customers of USI have moved with Miner to IOA is some evidence that Miner's relationship with USI's customers posed a "substantial risk" that he could divert USI business. Also, to the extent that USI can demonstrate that Miner was indeed a "top producer," [11] that would also constitute evidence of such risk. Thus, the

---

10. Whether the information at issue can be considered "confidential customer information" is discussed separately in Part I.B.6, *infra.*

11. Although USI uses the phrase "top producer" a number of times in its letters to describe Miner, USI has not provided the Court with specific citations to the record supporting such an assertion.

Court concludes that there is an issue of material fact as to whether Miner's services are unique or extraordinary.

### b. Whether the Agreement Imposes an Undue Hardship

Although the parties do not specifically focus on undue hardship, as noted above, USI is not seeking to preclude Miner from working as an insurance producer for IOA. USI instead seeks only to preclude Miner from soliciting or servicing former USI clients. USI does note, however, that Miner's employment agreement with IOA guarantees him a salary and an equity stake in the business. Accordingly, the Court finds that this prong favors USI.

### c. Public Policy

Finally, the parties only minimally discussed the public policy implications of the enforcement of this agreement. Accordingly, the Court finds that this factor does not cut in favor of either party, although New York courts generally disfavor broad restraints on competition. *See BDO,* 690 N.Y.S.2d 854, 712 N.E.2d at 1223.

Because the Court concludes that Miner has failed to carry his burden of demonstrating that there are no material issues of fact regarding the reasonableness of USI's restrictive covenants, Miner's motion is DENIED.[12]

### 5. Miner's Solicitation of Former Clients

USI also seeks partial summary judgment on the issue of whether Miner improperly solicited USI clients to transfer their business to Miner's new employer, IOA. Defendants cross-moved for partial summary judgment on the same issue,

contending that as a matter of law Miner did not solicit any former USI clients. For the reasons set forth below, USI's motion is GRANTED, and Defendants' cross-motion is DENIED.

Pursuant to the September 30, 2003 APA between Miner and USI, Miner sold to USI the business and goodwill of fifty-seven insurance clients as set forth in Schedule A of the APA. (*See* APA ¶ 1; Schedule A.) Furthermore, in the APA, Miner explicitly agreed that he would not:

(1) solicit, sell, provide or accept a request to provide, or induce the termination, cancellation or non-renewal of, any USI Business from or by any Person (i) whose account constituted a Client Account of the Purchaser or Serviced USI Company, at any time within the 24 months preceding the Effective Date, including, without limitation, an Account transferred hereunder as part of the Acquired Assets or (ii) who or which was an active prospective client of the Purchaser or such serviced USI Company; or (2) solicit, offer, negotiate or otherwise seek to acquire any interest in any Active Prospective Acquisition of the Purchaser . . . .

(APA ¶ 13(B).) As discussed above, Miner's Employment Agreement contained a nearly identical Non–Solicitation Agreement.

■■■■ New York law recognizes the enforceability of nonsolicitation covenants in employment agreements, so long as they are necessary to prevent disclosure of trade secrets or confidential information or where an employee's services are unique

---

**12.** Defendants also assert that USI can not demonstrate the necessary irreparable harm required to support its claim for injunctive relief. (*See* Miner June 24 Letter at 5–6.) In particular, Miner asserts that "[t]here is no evidence of any solicitations of any USI client by Miner." (*Id.* at 6.) However, as discussed

*infra* in Part I.B.5, the Court concludes that Miner did in fact solicit USI clients. Notwithstanding Miner's solicitation, Miner has also failed to demonstrate that USI has suffered no loss of goodwill as a result of Miner's actions. Accordingly, Miner has failed to demonstrate a lack of irreparable harm.

or extraordinary. *See Reed, Roberts Assocs.*, 386 N.Y.S.2d at 680, 353 N.E.2d 590. Also under New York law, a seller of goodwill has an "implied covenant" or a "duty to refrain from soliciting former customers, which arises upon the sale of the 'good will' of an established business." *Bessemer Trust Co. v. Branin*, 16 N.Y.3d 549, 556, 925 N.Y.S.2d 371, 949 N.E.2d 462 (2011) (quoting *Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276, 283, 437 N.Y.S.2d 646, 419 N.E.2d 324 (1981)). This implied covenant not to solicit former customers is permanent and not subject to divestiture after a reasonable amount of time has passed. *Id.* The duty not to solicit former clients arising from the sale of goodwill is distinct from the duty not to compete in the industry, which may only arise out of an express agreement. *Mohawk*, 52 N.Y.2d at 285, 437 N.Y.S.2d 646, 419 N.E.2d 324.

■■■ Here, Section 7.1 of the Employment Agreement expressly prohibited

Miner from soliciting various USI accounts for twenty-four months after the termination of the Employment Agreement.[13] The non-solicitation clause clearly indicated that Miner could not solicit former USI clients without violating the terms of his Employment Agreement.[14] Moreover, because New York law recognizes an implied covenant precluding solicitation after the sale of goodwill, it stands to reason that an express non-solicitation agreement would have equal if not greater weight when considering whether Miner's solicitation of USI clients was improper under New York law. *See Bessemer Trust Co.*, 16 N.Y.3d at 557–59, 925 N.Y.S.2d 371, 949 N.E.2d 462.[15]

In *Bessemer Trust Co.* the Court of Appeals discussed what constituted improper solicitation under New York law. 16 N.Y.3d at 557–59, 925 N.Y.S.2d 371, 949 N.E.2d 462. The Court held that solicitation could be found where a seller initiated contact with his former clients or where a

---

**13.** As discussed in Part I.B.4 *supra*, Miner acknowledged in Section 9.1 of his Employment Agreement that his services "are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such service." Even absent this acknowledgement, to the extent that USI can demonstrate that Miner's services were unique or extraordinary or that Miner misappropriated confidential information, the agreement would be enforceable. *See Reed, Roberts Assocs., Inc.*, 386 N.Y.S.2d at 680, 353 N.E.2d 590.

**14.** At this time, the Court does not determine whether any former USI clients left USI for IOA of their own volition, regardless of Miner's alleged solicitation. It is plausible that clients such as USA Container and Piramal, Inc., whom Miner points to as not being solicited, may have chosen to move their business to IOA simply because that *is* where Miner was currently employed. (*See* Miner June 29 Letter re: Solicitation, Decl. of John Criscuolo ¶¶ 3–4, dated Nov. 9, 2010; Decl. of David Ardire ¶ 4, dated June 28, 2011.) Clients are

free to choose where to conduct their business. *Bessemer Trust Co.*, 16 N.Y.3d at 555–57, 925 N.Y.S.2d 371, 949 N.E.2d 462. But this has no bearing on whether Miner's October 25, 2010 email was an improper solicitation.

**15.** Furthermore, New York law also recognizes an employer's interest in protecting clients procured through the use of a company's name and resources. *BDO*, 93 N.Y.2d 382, 392, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999); *see Ecolab, Inc. v. K.P. Laundry Mach., Inc.*, 656 F.Supp. 894, 899 (S.D.N.Y. 1987). Indeed, in Section 7.5(g) of his Employment Agreement, Miner acknowledged that USI has "a legitimate interest in preventing [Miner] from exploiting or appropriating the goodwill of a client or customer of [USI] which [Miner] acknowledges has been created and maintained at [USI's] expense." Because Miner procured clients while an employee at USI, solicitation of such clients after he departed from USI indicates a breach of the implied covenant regarding the sale of goodwill.

seller took affirmative steps to communicate directly with former clients. *Id.*; *see also, e.g., Hyde Park Prods. Corp. v. Lerner Corp.*, 65 N.Y.2d 316, 321, 491 N.Y.S.2d 302, 480 N.E.2d 1084 (1985) (barring deliberate solicitation of former clients that breached the implied covenant against the impairment of goodwill).[16] The Court of Appeals noted that a seller's initiation of contact with former clients was particularly relevant if the seller remained in the same industry. *Bessemer Trust Co.*, 16 N.Y.3d at 557–59, 925 N.Y.S.2d 371, 949 N.E.2d 462. According to the Court of Appeals, "[t]argeted mailings or ... individualized telephone calls" to former customers informing them of new business ventures constitute solicitation. *Id.* Furthermore, if a seller touted his new business venture, even if a former client contacted him first, such action would be considered solicitation. *Id.*

The Court of Appeals did note, however, that "absent an express or restrictive covenant not to compete," advertising to the general public should not be considered solicitation, so long as such advertisements are not specifically aimed at the seller's former clients. *Id.*[17] It would also be permissible for a seller to compete in the same industry so long as he did not "actively solicit such trade." *Mohawk*, 52 N.Y.2d at 285 n. 6, 437 N.Y.S.2d 646, 419 N.E.2d 324; *see also Von Bremen v. MacMonnies*, 200 N.Y. 41, 50–51, 93 N.E. 186 (1910). Moreover, if a client approached the seller of goodwill asking for factual information, this alone would not be considered solicitation so long as the response did not go beyond the specific information sought. *Id.*

 Here, on October 25, 2010, Miner sent an email to "everybody [he] knew that [he] had in [his] contact list," including USI clients and industry consultants. (USI June 28 Letter re: Solicitation, Ex. A, Miner Dep. 278:5–6, 280:3–8.)[18] The email stated:

> Please be advised that effective immediately, I have terminated my relationship with USI and have partnered with Insurance Office of America as the Executive Vice President, Regional Partner of the IOA Northeast N.Y. division.
>
> IOA ranked as the 28th largest broker of U.S. Business in 2009 brokerage revenues, according to Business Insurance's most recent rankings. IOA was ranked # 10 on the Insurance Journal's Top 100 Privately–Held Property/Casualty Agencies.
>
> IOA is firmly committed to providing you with exceptional service and as always I value our relationship.
>
> Please find my new contact information below.

(USI June 28 Letter re: Solicitation, Ex. B.)

First, by sending this email, Miner initiated contact with his former clients just days after he arrived at IOA. (*See* USI

---

**16.** Defendants assert that *Bessemer* is inapplicable because it addresses only the common law Mohawk doctrine and should not apply to the enforceability of an express non-solicitation provision. Defendants are mistaken. In *Mohawk*, the New York Court of Appeals distinguished between covenants to refrain from soliciting customers and express *non-competition* agreements. 437 N.Y.S.2d 646, 419 N.E.2d at 328. Such a distinction, however, is not at issue here. Instead, Plaintiffs seek to enforce an express covenant not to *solicit* former customers, rooted in the same concerns underlying the New York Court of Appeals' reasoning in *Bessemer*.

**17.** There is, of course, such a restrictive covenant in place here.

**18.** Additionally, Miner acknowledges that the contact list included some of the clients that Miner sold to USI pursuant to the APA.

June 28 Letter re: Solicitation, Ex. A, Miner Dep. 277:16–20.) Because Miner remained in the insurance industry, his initiation of contact with USI clients is even more relevant. *See Bessemer Trust Co.,* 16 N.Y.3d at 557–59, 925 N.Y.S.2d 371, 949 N.E.2d 462. By sending the email Miner took an active step in attempting to communicate with former clients, which is barred by the explicit nonsolicitation clause of the Employment Agreement, as well as the implied covenant under New York law. *See Hyde Park Prods. Corp.,* 65 N.Y.2d at 321, 491 N.Y.S.2d 302, 480 N.E.2d 1084.

Second, Miner's email reflects active solicitation of former USI clients. In his email, Miner described the accomplishments and attributes of his new company, IOA, implying that it would be advantageous for the former USI clients who received this email to transfer their business from USI to IOA. (*See* USI June 28 Letter re: Solicitation, Ex. B.) Although the email was sent to a number of recipients, including some personal contacts, also included were USI clients and other industry consultants whose contact information Miner had taken from USI and sent to his personal email account. (USI June 28 Letter re: Solicitation, Ex. A, Miner Dep. 278:5–6; Miner June 29 Opp. Letter re: Solicitation, Declaration of Patrick M. Collins, dated June 29, 2011 ("Collins Decl."), Ex. 1, D'Elia Dep. 153: 5–11.) [19]

Of particular importance is Miner's parting stanza: "IOA is firmly committed to providing you with exceptional service and as always I value our relationship." This language indicates that the email was not just "bragging", as Miner contends, but that it was in fact a targeted mailing to former customers informing them of Miner's new business ventures and therefore constituted an improper solicitation of USI clients. *See Bessemer Trust Co.,* 16 N.Y.3d at 557–59, 925 N.Y.S.2d 371, 949 N.E.2d 462. Although clients may have been free on their own to approach Miner with mere inquiries about IOA (*see, e.g.,* Miner June 29 Opp. Letter re: Solicitation, Collins Decl., Ex. 4, Ardire Decl. ¶ 4), Miner's email did significantly more than simply answer clients' questions; by expounding that "IOA is firmly committed to providing you with exceptional service," Miner was blatantly touting the merits of his new firm to former clients.[20]

Thus, the Court concludes that Miner improperly solicited former USI clients by sending an email to these clients informing them of his move to IOA, describing the accomplishments of IOA, and stating IOA's commitment to providing them with exceptional service. As a matter of law this email constituted solicitation. Accordingly, USI's motion for partial summary judgment on this issue is GRANTED, and Defendants' cross-motion for partial summary judgment is DENIED.

6. USI's Confidential Information

In his June 28 Letter re: Conf. Info., Miner asserts that as a matter of law the information contained in the emails he forwarded from his USI email account to his personal email address—which on their

---

**19.** Miner's argument that the email was not targeted because it also included friends and family is meritless. The relevant point is that it was targeted to USI clients.

**20.** It may have been permissible for Miner to inform his former clients with whom he had a professional relationship that he was moving to a new company. *Muhlstock v. Cole,* 245

A.D.2d 55, 666 N.Y.S.2d 116, 120 (N.Y.App. Div.1997) (citing *Graubard Mollen Dannett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 120, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (1995)). Miner's email, however, did more than merely inform former clients of his change of employer and, under the New York cases, constitutes solicitation.

face appear to include client coverage, contact, and policy information—was not confidential or protected as a trade secret. For the reasons that follow, Miner's motion is DENIED.

As previously discussed, Miner's employment at USI was governed by the Employment Agreement. Paragraph 6.3 of the Employment Agreement states:

> Employee will not use, or willfully disclose, to any Person, any Confidential Information (determined as of the date of termination of Employee's employment with the Company) of the Company or any Serviced USI Company, except (a) in the normal course of business on behalf of the Company ... as the case may be, (b) with the prior written consent of the Company or such Serviced USI Company, as the case may be, or (c) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction or other legal process, in which event Employee shall notify the Company ... as promptly as practicable (and, if possible, prior to the making of such disclosure). In addition, Employee will use reasonable efforts to prevent any such prohibited use or disclosure by any other Person.

(*Id.* ¶ 6.3.)

Under the Employment Agreement, "Confidential Information" means "any proprietary information of a specified Person, determined as of a specified date, that is not already generally available to the public (unless such information has entered the public domain and become available to the public through no fault on the part of the Party to be charged hereunder) ...." (*Id.* ¶ 1.1.) Examples of Confidential Information include:

(a) the identity of any client;

(b) information about key contacts at each client;

(c) servicing costs for any client; ...

(f) the specific insurance policies purchased by any client;

(g) the expiration dates, rates, fees, and premiums paid by any client;

(h) the risk specifications and claims loss histories of any clients;

(i) the nature of programs and plans, funding and administration, demographic characteristics and any other information supplied by, or developed for, any clients; ...

(k) financial information, including information set forth in internal records, files and ledgers, or incorporated in profit and loss statements, fiscal reports and business plans; ...

(n) all internal memoranda and other office records, including electronic and data processing files and records.

(*Id.* ¶ 1.1(a)-(c), (f)-(i), (k), (n).)

As previously noted, New York law governs the Employment Agreement. (*Id.* ¶ 14.) "In New York, properly scoped noncompetition agreements are enforceable to protect an employer's legitimate interests so long as they pose no undue hardship on the employee and do not militate against public policy." *Visentin*, 2011 WL 672025, at *8 (citing *BDO*, 690 N.Y.S.2d 854, 712 N.E.2d at 1223). "Trade secrets and confidential information count among employer interests courts recognize as 'legitimate.'" *Id.* (citing *Reed, Roberts Assocs., Inc.*, 386 N.Y.S.2d 677, 353 N.E.2d at 593). "Only that confidential information or those trade secrets that the employee misappropriates or will inevitably disclose is protectable." *Id.; see also N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir.1999).

 Under New York law, a "trade secret" is "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *N. Atl. Instruments*, 188 F.3d at 44 (internal quotation marks omitted); *accord Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 604 N.Y.S.2d 912, 624 N.E.2d 1007, 1012–13 (N.Y.1993) (citing Restatement of Torts § 757 cmt. b (1939)). "A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir.1985); *see also IBM v. Papermaster*, No. 08–CV–9078, 2008 WL 4974508, at *7–8 (S.D.N.Y. Nov. 21, 2008) (noting that strategic plans, product development, technical recruitment, and long-term business opportunities are protectable as trade secrets).

 Whether information constitutes a trade secret is "generally a question of fact." *Medtech Prods. Inc. v. Ranir, LLC*, 596 F.Supp.2d 778, 787 (S.D.N.Y.2008) (citing *Ashland Mgmt.*, 604 N.Y.S.2d 912, 624 N.E.2d at 1013). New York courts consider the following factors when determining whether certain information constitutes a trade secret:

(1) the extent to which the information is known outside of the business;

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken by the business to guard the secrecy of the information;

(4) the value of the information to the business and its competitors;

(5) the amount of effort or money expended by the business in developing the information; and

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*N. Atl. Instruments*, 188 F.3d at 44 (quoting *Ashland Mgmt.*, 604 N.Y.S.2d 912, 624 N.E.2d at 1013). "Despite these factors, the most important question before the trier of fact is whether or not the information is in fact secret." *Derven v. PH Consulting, Inc.*, 427 F.Supp.2d 360, 371 (S.D.N.Y.2006) (citing *Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 298 (2d Cir.1986)).

 Consideration of the relevant factors indicates that the information Miner forwarded to his personal e-mail account is protectable as a trade secret. The information at issue consists of, among other things, documents purportedly containing lists of USI clients and revenue associated with USI clients (*see, e.g.*, USI June 29 Opp. Letter re: Conf. Info., Ex. G) and documents concerning USI clients' coverage and insurance policies (*see, e.g., id.* Exs. H, I). While the record is insufficiently developed to allow the Court to make a determination with respect to the second, fourth, or fifth factors, consideration of the first, third, and sixth factors show that there are genuine issues of material fact as to whether the information Miner e-mailed himself should be treated as a trade secret.

With respect to the first factor, the record shows that USI treated confidentially all information about the identity of its clients (Miner June 28 Letter re: Conf. Info., Ex. 9, Butler Dep. at 28:7–30:22), the type of insurance purchased by clients (Miner June 28 Letter re: Conf. Info., Declaration of Patrick M. Collins re: Confidential Information ("Collins Conf.

Decl."), Ex. 11, Caccese Dep. at 8:9–16), and the terms of these policies (*id.* at 8:21–24). Although the parties agree that some confidential information could be gathered from outside sources, the Court assumes that the detailed internal correspondence between and among USI personnel that Miner forwarded to his personal e-mail address is not publicly available. Viewing the evidence in the light most favorable to USI, the first factor favors USI. *Cf. N. Atl. Instruments,* 188 F.3d at 45 (discussing importance of information not being "readily available" to others).

With respect to the fifth factor, USI undertook a significant effort to ensure the secrecy of client information by requiring all employees to sign confidentiality agreements (USI June 29 Opp. Letter re: Conf. Info., Exs. A, B), implementing measures to secure electronically stored information (USI June 29 Opp. Letter re: Conf. Info., Ex. C, Porreca Dep. at 9:7–11:25), and issuing a compliance manual for safeguarding confidential information (USI June 29 Opp. Letter re: Conf. Info., Ex. D). Nothing in the record suggests that USI was lax in observing these procedures. Thus, the fifth factor favors USI. *Cf. N. Atl. Instruments,* 188 F.3d at 45 (discussing "numerous measures" used to prevent disclosure of client information).

With respect to the sixth factor, it would take "significant effort" to obtain the client information at issue. (Miner June 28 Letter re: Conf. Info., Collins Conf. Decl., Ex. 8, D'Elia Dep. at 171:5–172:10.) Indeed,

Miner himself admits that the reason why he did not compile the information on his own was because he was "lazy." (Miner June 28 Letter re: Conf. Info., Collins Conf. Decl., Ex. 3, Miner Dep. 302:15–18.) Thus, the sixth factor favors USI. *Cf. N. Atl. Instruments,* 188 F.3d at 45–46 (affirming extension of trade secret protection where confidential information could only be duplicated "with great difficulty").

Finally, on balance, the record shows that USI endeavored to treat all client information, including the information Mr. Miner sent to himself, confidentially (Miner June 28 Letter re: Conf. Info., Collins Conf. Decl., Ex. 9, Butler Dep. 26:8–32:15), and USI has proffered exhibits suggesting that some of the documents Miner e-mailed himself did, in fact, contain confidential information (*See, e.g.,* USI June 29 Opp. Letter re: Conf. Info., Exs. G–I).[21] While Miner alleges that this information was readily available to him through other sources, the facts proffered by USI are sufficient to create genuine issues of material fact as to whether the information Miner forwarded to his personal email account is protectable as a trade secret. Consequently, Miner's motion for a ruling that the information at issue is not confidential is DENIED.

### 7. USI's Delay in Seeking Injunctive Relief

■ Finally, the Court addresses briefly whether USI should be precluded from seeking injunctive relief due to any undue delay. Miner baldly asserts that

---

**21.** Perhaps the most telling piece of evidence supporting USI's claim of misappropriation of trade secrets is an e-mail sent from Miner's USI e-mail address to his personal account. The email is then forwarded from Miner's personal account to Wesley Scovanner and John Ritenour at IOA. (USI June 29 Opp. Letter re: Conf. Info., Ex. G.) Attached to the email is an excel spreadsheet named "Miner_-2010_Estimated_Book_of_Business.xls."

(*Id.*) At first blush, the eleven-page spreadsheet contains the names of dozens of companies with columns of what appears to be financial information that could be considered confidential. (*Id.*) Lacking an explanation of what the columns of financial information contain, however, the Court is unable to determine what the specific data is, whether USI treated it confidentially and whether it was publicly available.

"USI has delayed without justification its request for injunctive relief and request for a hearing thereon," thereby "undercutting its assertions of urgency and imminent irreparable harm." (Miner June 24 Letter at 9.) But, as USI correctly argues, this assertion is unsupported by the record. The Court acknowledges that while there have been numerous procedural setbacks, these can hardly be considered to be the fault of USI. As USI points out, it was granted a temporary restraining order against Miner on November 17, 2010, less than a month after USI's commencement of the present action against Miner. [dkt. no. 11] The preliminary injunction hearing was originally scheduled for December 14, 2010 [dkt. no. 4] but has been rescheduled a number of times on consent through no fault of USI. Despite numerous procedural delays with which the Court is intimately familiar, the Court is persuaded that USI diligently has sought to protect its interests in this litigation. (*See, e.g.,* USI June 28 Letter re: Undue Delay, Ex. E (indicating that USI believed a delay in the preliminary injunction hearing would be "prejudicial").) Accordingly, Miner's motion requesting a finding that USI engaged in undue delay is DENIED.

## II. Conclusion

The Court has considered all other arguments and finds them to be without merit. For the foregoing reasons, the Court concludes as follows:

| | |
|---|---|
| Plaintiff's motion for a ruling that Miner did not comply with the Notice–of–Breach provision of Section 4.2 of the Employment Agreement | GRANTED |
| Defendants' motion for a ruling that the restrictive covenants contained in the Employment Agreement are unenforceable and that USI has failed to show irreparable harm | DENIED |
| Plaintiff's motion for a ruling that Miner solicited USI clients | GRANTED |
| Defendants' cross-motion for a ruling that Miner did not solicit USI clients | DENIED |
| Defendants' motion for a ruling that Miner did not misappropriate confidential information | DENIED |
| Defendants' motion for a ruling that USI engaged in undue delay | DENIED |
| Plaintiff's motion for a ruling that Miner did not comply with Section 8.3 of the Employment Agreement | GRANTED |
| Defendants' motion for a ruling that USI breached the Employment Agreement | DENIED |

Miner's counterclaims against USI based upon alleged violations of Section 4.2 of the Employment Agreement are also DISMISSED with prejudice.

SO ORDERED.