NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-1338
_____

OPHRYS LLC, a Washington limited liability company,

Appellant

v.

ONEMAIN FINANCIAL INC., a Delaware Corporation;
ONEMAIN FINANCIAL, INC., a West Virginia Corporation;
ONEMAIN FINANCIAL, INC., a Minnesota Corporation;
ONEMAIN FINANCIAL, INC., a HAWAII Corporation;
CF NETWORK ISSUANCE TRUST 2010-1, a Delaware Corporation

_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-17-cv-00260)
District Judge: Honorable Richard G. Andrews

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 21, 2020

Before: AMBRO, PORTER, and ROTH, Circuit Judges

(Opinion filed February 17, 2021)

_____

OPINION[*]

_____

AMBRO, <u>Circuit Judge</u>

Ophrys, LLC, appeals the District Court's grant of summary judgment to

OneMain Financial Group, LLC,[1] in this contract dispute case. For the reasons stated

below, we affirm.

## I. Factual and Procedural Background

### A. The Flow Forward Agreement

Ophrys, a debt buyer and collector, and OneMain, a loan provider that sells

portfolios of consumer debt, entered into a "forward flow" agreement (the "Agreement"),

under which Ophrys purchased defaulted consumer loan accounts from OneMain on a

monthly rolling basis. The accounts Ophrys bought were supposed to be in Chapter 13

bankruptcy proceedings. Sales under the Agreement occurred between April 2013 and

December 2014, with the final two sales occurring on November 24 and December 23,

2014.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] Appellees are OneMain Financial Group, LLC, a Delaware corporation; OneMain Financial, Inc., a Hawaii corporation; OneMain Financial, Inc., a West Virginia corporation; OneMain Financial of Minnesota, Inc. f/k/a OneMain Financial, Inc., a Minnesota corporation; and CF Network Issuance Trust 2010-1 (collectively, "OneMain").

With each sale, Ophrys was provided with asset schedules and electronic data files for the accounts being sold. Section 3.3.1 of the Agreement contains representations by OneMain about the accounts sold to Ophrys, including the accuracy of the data files provided to it. Specifically, under § 3.3.1(j), OneMain represented that "information provided . . . on the due diligence file" during the auction that preceded the Agreement "is substantially similar to the final electronic file . . . ." J.A. 559. Under Section 3.3.1(k), it also represented that the "information provided . . . on the final electronic file" is "materially true and correct." *Id*. Ophrys alleges OneMain breached these provisions.

The Agreement also included specific provisions that set out procedures for Ophrys to comply with before suing OneMain for breach of the Agreement. Section 3.4(a) states that Ophrys's "sole remedy" against OneMain "for a breach of any of the representations" in Section 3 (other than an indemnification provision not relevant here) "shall be to notify [OneMain] of the breach ('Notice of Claim') no later than 180 days from the applicable Closing Date" (hereafter, the "Notice of Claim provision"). J.A. 556. Section 3.4(b), in turn, outlined the specific detailed information that Ophrys was required to provide OneMain for each allegedly deficient account in a Notice of Claim submitted under Section 3.4(a). J.A. 557. The latter section also stated that "[Ophrys's] failure to provide a Notice of Claim with respect to any claimed breach of [OneMain] as provided in this Section 3.4 shall terminate and waive any rights [Ophrys] may have to any remedy for breach under [Section] 3 of this Agreement." J.A. 556.

Relatedly, under Section 12.3 of the Agreement, Ophrys was obliged to send all required notices to OneMain's General Counsel in Baltimore, Maryland, and a copy to

3

the attention of Michael Taulbee with Citicorp Credit Services, Inc. in Kansas City, Missouri. Section 12.3 specifically identified these individuals as the "persons to whom must be sent all notices . . . required to be given under this Agreement by giving written notice to the other party." J.A. 568.

Dealing with defective accounts in the portfolios sold under the Agreement was common. Ophrys notified OneMain of deficiencies, and in most cases OneMain either cured the deficiency or repurchased the affected Accounts. Sometimes OneMain asked for additional information before it decided how to proceed. The parties called this process "putbacks."

**B. Communications Among the Parties**

Ophrys points to several communications about missing account information among the parties as evidence that it sent OneMain notice of its intent to sue for breach of the Agreement. For example, on September 13, 2013, an account-level employee in Asset Sales Support at Citibank (Citibank owned OneMain) emailed an Ophrys representative in response to a "putback request" and stated: "Going forward please submit all putbacks and account level questions to: assetsalessupport@citi.com[] and not to our individual emails as it causes email overload." J.A. 714.

On December 12, 2014, an Ophrys data operations-employee emailed the "assetsalessupport@citi.com" address: "We have attached a file containing POC accounts that were purchased by Ophrys, which we are seeking more information." J.A. 717. The email's attachment identified 1,691 accounts that were allegedly missing information.

4

Neither the body of the email nor the attachment made reference to the Agreement, OneMain's obligations under Section 3, or the Notice of Claim provision.

Then on May 2, 2015, Ophrys's Chief Operating Officer emailed the same address with an attached letter addressed to the "Asset Sales Team." J.A. 1152. The email complained of the team's alleged failure to provide the "information requested" in the December 2014 and January 2015 emails, which Ophrys stated was needed to comply with regulations for filing claims in bankruptcy proceedings. It also sought a "special putback provision" for those accounts Ophrys could not collect because it "did not receive the requested guidance or a timely response." *Id.* The email did not mention the Agreement or the Notice of Claim.

When Ophrys received no response, it sent another email on May 14, 2015, stating, "[p]lease find the attached password protected file containing the putback request for the Ophrys, LLC Citibank POC purchases." J.A. 1154. The email also attached a spreadsheet listing 318 accounts Ophrys wanted repurchased. It made no reference to the Agreement, and the bulk of the accounts identified on the spreadsheet indicated a sale date more than 180 days before the spreadsheet was sent.

On May 26, 2015, a Citibank asset-sales employee emailed two Ophrys representatives "to discuss . . . concerns [Ophrys has] expressed over necessary data elements relating to Bankruptcy Rule 3001." J.A. 779. The parties spoke the following day. A May 28, 2015 email from Ophrys's Chief Operations Officer to three Citibank employees, with the subject "Follow Up – 3001 Data Information," explained that during the May 26 conversation the parties "discuss[ed] bankruptcy required information related

5

to accounts that [Ophrys] h[ad] purchased." J.A. 804. The May 28 email included information and attachments that Ophrys asked the Citibank employees to review.

On June 3, 2015, another Citibank employee emailed Ophrys about its "request to exercise a putback." J.A. 806. The employee noted that Citibank had "review[ed] the information" in the May 28 email and concluded that the account information was "fully disclosed during the bid process." *Id.* The email further emphasized that while Citibank's "goal" was "to provide support post sale" for Ophrys, it was not "obligat[ed] to provide additional data other than what was contractually agreed to at the time of sale." *Id.* Thus, Citibank declined "to buy the accounts back." *Id.*

In a November 12, 2015 email, the same Citibank employee reaffirmed that while Citibank was "not obligated to repurchase [the] accounts" from Ophrys, Citibank would "like to partner with [Ophrys] to provide the data needed on the[] accounts[,]" and asked for "the opportunity to meet" with Ophrys to "see if it [was] feasible to provide the data needed." J.A. 820.

Four weeks later, having received no response from Ophrys, the Citibank employee sent a follow-up email stating that Citibank was "still considering the [putback] request and need[ed] additional information." J.A. 826. On December 15, 2015, Ophrys sent the requested information but failed to mention the Agreement or allege that OneMain breached its terms.

Ultimately, despite further communications, the parties "failed to resolve their dispute." J.A. 5. On August 26, 2016, over a year and a half (and well over 180 days) after the last customer account sale to Ophrys, Ophrys's Chief Legal Officer sent a

6

"formal notice under Section 12.3 of the Agreement" to both OneMain's General Counsel in Baltimore, as well as Michael Taulbee with Citicorp Credit Services, Inc. in Kansas City. J.A. 1280–82.

### C. Procedural History

In March 2017, Ophrys filed this suit alleging that OneMain breached the Agreement by failing to provide information about the accounts sold to Ophrys. After a partial dismissal, several amended complaints (amended to allege adequately that Ophrys complied with the Agreement's Notice-of-Claim provision), and extensive discovery, the District Court ultimately granted summary judgment in favor of OneMain, as there was no genuine issue of material fact that Ophrys "failed to comply with the notice provision" in the Agreement, J.A. 2, therefore terminating and waiving its claims.

The Court emphasized that, while the Notice of Claim provision "required Ophrys to notify OneMain of a breach within 180 days of the purchase[] and . . . send the notice to OneMain's general counsel[,]" the record demonstrated that "Ophrys emailed mere inquiries, not a notice of breach, to 'assetsalessupport@citi.com.'" J.A. 7. Ophrys did not send a "formal notice" to OneMain's General Counsel as required until August 2016, "far more than 180 days after the relevant purchases." *Id.*

The District Court also rejected Ophrys's argument that its failure to comply strictly with the mandatory notice provision could be excused under New York's limited exception excusing strict compliance with a notice provision where there was actual notice and no prejudice from the deviation. It found that none of the "communications within the 180-day window" on which Ophrys relied in opposing OneMain's summary

7

judgment motion were sufficient to satisfy the notice provision here because they "merely requested more information about certain accounts[,]" J.A. 8, and did not "referenc[e] a breach of the contract or the potential for litigation." J.A. 8–9. As "[n]o reasonable jury could conclude that" Ophrys's "request[s] for information [were] enough to 'objectively' put OneMain on notice of a breach[,]" J.A. 8, the Court determined that "Ophrys [] failed to point to any communications that reasonably could have satisfied the notice requirement," J.A. 9.

Finally, it declined to reach OneMain's argument that Ophrys's purported notices were deficient because they were sent to account-level employees' email addresses instead of individuals listed in Section 12.3 of the Agreement.

## II.    Discussion[2]

Ophrys's arguments that it was not required to submit a Notice of Claim, or that any notice of a breach satisfied the Agreement's Notice of Claim provision, fail. We agree with the District Court that Section 3.4(a)'s language required Ophrys to submit a Notice of Claim. The Notice-of-Claim provision is clear and unambiguous: To avoid

---

[2] The District Court had jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We "employ a plenary standard in reviewing orders entered on motions for summary judgment, applying the same standard as the district court." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). Federal Rule of Civil Procedure 56(a) provides, in part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." We view the evidence in the light most favorable to the nonmovant, *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009), but "[t]he mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Id.*

"terminat[ion] and waive[r]" of its "sole remedy" against OneMain for an alleged breach of the representations in Section 3, Ophrys was required to submit a Notice of Claim "no later 180 days from the applicable Closing Date" to specific addressees with specific information regarding each allegedly deficient account. J.A. 556–57. That provision states clearly that "[Ophrys's] failure to provide a Notice of Claim with respect to any claimed breach of [OneMain] . . . shall terminate and waive any rights [Ophrys] may have to any remedy for breach." J.A. 556.

We also agree with the District Court that "Ophrys failed to comply with the literal terms of the contract's notice provision[,]" J.A. 7, as the alleged notices Ophyrs points to do not satisfy that provision. For example, an email from an Ophrys data operations employee to the "assetsalessupport@citi.com" address stating, "[w]e have attached a file containing POC accounts that were purchased by Ophrys, which we are seeking more information[,]" J.A. 717, did not provide notice of a lawsuit. The email identified missing information only, and many emails just like it were sent in the course of the parties' dealings with each other. That several further emails, follow-ups, and calls ensued does not change the nature of the communications.

The Court correctly concluded the communications that Ophrys relied on did not provide "actual notice" of an alleged breach to OneMain because they "merely requested more information about certain accounts" as part of the back-and-forth process through which the parties shared account information after sales, and did not "referenc[e] a breach of the contract or the potential for litigation." J.A. 8–9. And in any event, these

9

communications were not sent within the 180-day window to provide notice as required by Section 3.4(a), nor were they sent to the correct person or address per Section 12.3.

New York courts "have long adhered to the sound rule in the construction of contracts, that where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language." *R/S Assocs. v. New York Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002) (citation and internal quotation marks omitted). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). Ophrys points to no compelling reason why we should look past the clear and unambiguous language of the Notice-of-Claim provision.

Ophrys's argument that summary judgment is inappropriate because "[e]vidence of how the parties applied Section 3.4 in their course of dealing" establishes that it "complied with its notice obligations under Section 3.4," Ophrys Br. 19, 23, also fails because the Notice-of-Claim provision is unambiguous on its face, and the extrinsic evidence relied on by Ophrys cannot vary its terms. *See W.W.W. Assocs., Inc.*, 566 N.E.2d at 642 ("It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." (citation and internal quotation marks omitted)); *Teitelbaum Holdings, Ltd. v. Gold*, 396 N.E.2d 1029, 1032 (N.Y. 1979) ("Interpretation of an unambiguous contract provision is a function for the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument.").

Finally, as a general matter, "written notice requirements are fully enforceable" under New York law. *Art of War Music Pub., Inc. v. Mark Andrews*, No. 98-cv-6034, 2000 WL 245908, at *2 (S.D.N.Y. Mar. 3, 2000). Ophrys does not point to any evidence that would allow us to apply New York law's limited exception excusing strict compliance with a contractual notice provision where there was actual notice and no prejudice from the deviation. *See Dellicarri v. Hirschfeld*, 619 N.Y.S.2d 816, 817 (N.Y. App. Div. 1994). We agree with the District Court that Ophrys failed to notify OneMain of a breach and that OneMain was prejudiced by Ophrys's deviation. First, as the Court explained, under longstanding New York contract law, "[n]otice of a breach must 'objectively' put a party on notice of the 'drastic legal repercussions that could result from noncompliance[,]" J.A. 8 (citing *Gil Enterprises, Inc. v. Delvy*, 79 F.3d 241, 246–47 (2d Cir. 1996)), and "[n]o reasonable jury" could find that Ophrys's mere "request[s] for information" were "enough to 'objectively' put OneMain on notice of a breach," J.A. 8.[3]

---

[3] Ophrys maintains that the Court erred by relying on "contract termination cases" to "impos[e] notice requirements that are not in the parties' agreement and cannot be justified under applicable law." Ophrys Br. 35, 37. However, *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175 (S.D.N.Y. 2011), was not merely a contract termination case. It addressed whether a party was barred from asserting a breach-of-contract claim based on its failure to comply with a contractual notice provision. The Court concluded that the plaintiff had "failed to provide adequate notice" under the parties' contract, *id.* at 184, and granted summary judgment in favor of the defendant on the breach-of-contract claim. Like here, the district court observed that none of the communications concerning alleged discrepancies in the plaintiff's compensation showed that the defendant was put on notice or was aware that the discrepancies were a breach of the contract. *Id.* at 183. Ophrys also attempts to distinguish *Gil Enterprises.* That case did involve notice as a condition precedent to terminating an agreement, but the court's recognition that notice of a breach must "objectively" put a party "on notice of the drastic legal repercussions that could result from noncompliance" is an uncontroversial rule that applies here. *Gil Enterprises*, 79 F.3d at 246; *see also In re 4Kids Ent., Inc.*, 463 B.R. 610, 685 (Bankr. S.D.N.Y. 2011)

11

Second, as a result of Ophrys's failure to comply strictly with the Notice-of-Claim provision, OneMain was prejudiced by being denied its bargained-for opportunity to review and, if necessary, cure the purported breaches or repurchase the allegedly affected accounts before this case was brought. *See Miner*, 801 F. Supp. 2d at 184 (granting summary judgment on breach-of-contract claim where the allegedly breaching party "was not afforded a real opportunity to cure the alleged defect" under the parties' agreement). OneMain had no notice that Ophrys was threatening to sue. OneMain argues that it was prejudiced because under this provision Ophrys was barred from alleging its breach-of-contract claims without first complying with the specific, bargained-for Notice-of-Claim procedures, and it has now mired the parties in protracted litigation without first satisfying the requisite procedures. Thus Ophrys cannot benefit from the narrow exceptions excusing strict compliance with a contractual notice provision.

\* \* \* \* \*

Accordingly, we affirm the District Court's order in its entirety.[4]

---

(relying on *Gil Enterprises* in holding that "precatory language" is insufficient to "objectively put" a breaching party "on notice").

[4] Because we affirm the District Court on the ground that the language of the Notice-of-Claim provision was unambiguous, Ophrys failed to comply strictly, and no exception to compliance applies, we need not reach OneMain's other arguments that the Notice of Claim was an enforceable condition precedent to the breach-of-claim suit moving forward, or that Ophrys also failed to comply with Section 12.3 of the Agreement.